ABRAM LACHMAN *et al.*

*v.*

MORRIS T. MARTIN *et al.*

*Filed at Ottawa October 31, 1891.*

1. MARRIED WOMAN — *control of separate property — employment of husband as agent.* Since the act of 1874 a married woman may have her own separate property, and make contracts and do business as a *feme sole,* and may avail herself of the services and agency of her husband in the conduct of her business or management of her property, without necessarily subjecting the profits arising from his management to the claims of his creditors.

2. FRAUDULENT CONVEYANCE — *concealing assets — transactions between husband and wife scrutinized.* An insolvent debtor can not use his wife's name as a mere device to cover up and keep from his creditors the assets and profits of a business which is in fact his own. Transactions between husband and wife having the appearance of being fraudulent will be closely scrutinized by the courts.

3. It is a question of fact, to be determined from all the circumstances of the case, whether or not a husband is carrying on his own business or is merely managing his wife's business. It must clearly appear that the wife is the *bona fide* owner of the capital invested in the business, and that the accumulations which result from the conduct of the business are the legitimate outcome of the investment of her property.

4. In this case, which was upon creditor's bill, to subject certain real estate held in the name of the debtor's wife, to the payment of the husband's debts, the facts and circumstances are stated, which show that the debtor's business was carried on in his wife's name, to cover up the same, and place his means, earnings and profits beyond the reach of his creditors, and that in fact the means of conducting the business was furnished by him, and that the large gains from the business were the product of his own shrewdness and skill as a gambler,. and not the result of his wife's investment.

APPEAL from the Appellate Court for the First District;— heard in that court on appeal from the Circuit Court of Cook county; the Hon. OLIVER H. HORTON, Judge, presiding.

Messrs. HOFHEIMER & ZEISLER, for the appellants:

When a colorable arrangement of this kind is made, by which an insolvent conducts a mercantile business in his wife's name, the business and profits are subject to the claims of his creditors. *Hyde* v. *Frey*, 28 Fed. Rep. 819.

The result of a man's labor, skill, intelligence or ingenuity is a capital, which a man has no right to make a gift of to his wife or to any other person as long as his debts are unpaid. After providing for the support of his wife and family, a man has no right to divert the surplus earnings arising from the exercise of his faculties to any other purpose than the payment of his just debts. *Wortman* v. *Price*, 47 Ill. 22; *Wilson* v. *Loomis*, 55 id. 352; *Robinson* v. *Brems*, 90 id. 351; *Guill* v. *Hanny*, 1 Bradw. 490; *Card* v. *Robinson*, 2 id. 19.

Messrs. BISBEE & REED, for the appellees:

The creditors of an insolvent have no claim upon his services. They can not compel him to work and earn wages for their benefit. A husband may, in the management of his wife's business or separate property, work for her, as any other person might, without any compensation. *Miller* v. *Peck*, 18 W. Va. 81; *Knapp* v. *Smith*, 27 N. Y. 278; *Gage* v. *Duchy*, 34 id. 203; *Buckley* v. *Wells*, 33 id. 518; *Dayton* v. *Walsh*, 47 Wis. 113; *Kutcher* v. *Williams*, 40 N. J. Eq. 436; *Shackleford* v. *Collier*, 6 Bush, 159; *Fletcher* v. *Radford*, id. 171; *Aldridge* v. *Muirhead*, 11 Otto, 390; *Stevens* v. *Fullington*, 59 Vt. 671; *Haight* v. *McVeagh*, 69 Ill. 624; *Primmer* v. *Clabaugh*, 78 id. 94; *Blood* v. *Barnes*, 79 id. 437; *Bennett* v. *Stout*, 98 id. 47; *Hamilton* v. *Hamilton*, 89 id. 349; *Taylor* v. *Boardman*, 92 id. 566; *Cubberly* v. *Scott*, 98 id. 38; *Thomas* v. *Mueller*, 106 id. 36; *Casner* v. *Preston*, 109 id. 539.

Mr. CHIEF JUSTICE MAGRUDER delivered the opinion of the Court:

This is a creditor's bill filed on July 26, 1889, in the Circuit Court of Cook County by the appellants against the appellees. It sets up the recovery of a judgment for $1802.43, and costs, on December 4, 1882, in said court, by appellants against Morris T. Martin and Harry Lawrence, and the issuance of execution thereon and the return of the same unsatisfied. The bill seeks to subject to the payment of the judgment certain lands, the title to which is held by the appellee, Carrie E. Martin, the wife of the appellee, Morris T. Martin, one of the judgment debtors, upon the alleged ground that such lands were purchased with funds belonging to Morris T. Martin, and that the conveyances to his wife were made for the purpose of hindering, delaying and defrauding his creditors. The cause was heard in the Circuit Court upon pleadings and proofs, and the hearing resulted in a decree dismissing the bill for want of equity, which decree has been affirmed by the Appellate Court.

The lands in question consist of three farms in Lake County: the Spring farm containing 140 acres, the Emmett farm containing 80 acres, and the Trude farm containing 123 acres: and a house and lot on Oakwood Boulevard in Chicago, and also two lots and a house at Park Manor in Cook County between Chicago and Englewood. The question is, whether this property belongs to Mrs. Martin, or whether it must be regarded as the property of her husband, Morris T. Martin, as between him and his creditors.

It is claimed, that Mrs. Martin purchased with her own funds one half of the stock of a corporation organized, under the statute of Illinois, "to buy and sell stock, grain and provisions on commission," and that the money, with which said property was purchased, was earned in the business of said corporation, while her interest in it was under the management and control of her husband, acting therein as her agent. Out

of the monies, thus alleged to have been realized as the profits
of said business, $5500.00 in cash were paid for the Oakwood
Boulevard property, subject to a mortgage thereon of $5000.00,
in March, 1885; $7700.00 in cash were paid for the Spring
farm in the early part of October, 1885; $5600.00 were paid
for the Emmett farm, $4400.00 in the latter part of October,
1885, and $1200.00 in October, 1886; $4500.00 were paid
for the Trude farm in the fall of 1886; the Park Manor prop-
erty, which was subject to a mortgage of $6500.00, was
obtained in 1887 by trading therefor two horses upon the Em-
mett farm valued at $3000.00 apiece; $2000.00 were spent
between 1886 and 1889 in the erection of a barn on the Em-
mett farm, and some $2000.00 or $3000.00 were invested in
stock thereon. Mrs. Martin and her husband moved into the
Oakwood Boulevard house in April, 1885, taking with them,
from a house on Wood St. in Chicago theretofore occupied and
owned by him, the furniture which belonged exclusively to
him. Thence in May, 1886, they moved to the Emmett farm
where they lived until November, 1889, at which latter date
they moved into the Park Manor house, and are now living
there.

The proof shows that, out of the monies earned in said
business or venture, between $25,000.00 and $30,000.00 have
been invested in real and personal property in Lake County,
and that the said Lake County farms and the stock thereon
are now worth $50,000.00.

Since the Act of 1874 in relation to "Husband and Wife"
(Rev. Stat. chap. 68), a married woman may have her own
separate property, and make contracts and do business as a
*feme sole*, and may avail herself of the services and agency of
her husband in the conduct of her business, or management
of her property, "without necessarily subjecting it, or the
profits arising from his management, to the claims of his
creditors." But an insolvent debtor cannot use his wife's
name as a mere device to cover up and keep from his creditors,

the assets and profits of a business which is in fact his own. The marriage relation affords many opportunities for conducting schemes to defraud creditors, and hence transactions between husband and wife, which have the appearance of being fraudulent, will be closely scrutinized. It is a question of fact to be determined from all the circumstances of the case whether· or not the husband is carrying on his own business, or is merely managing his wife's business. It must clearly appear that the wife is the *bona fide* owner of the capital invested in the business, and that the accumulations, which result from the conduct of the business, are the legitimate outcome of the investment of her property.

From a careful study of the evidence in this case we are satisfied that a cunning scheme was devised for the purpose of preventing the creditors of Morris T. Martin from reaching his property, and that the money used in the purchase of the real estate conveyed to his wife was acquired by his own shrewdness in the management of an unlawful enterprise.

Prior to 1876 or 1877 Morris T. Martin, according to his own statement, "had been interested in what is known to the intelligent class of Chicago as a gambling house." Having thereby obtained $40,000.00 he invested it in the firm of Lawrence & Martin, engaged in the wholesale liquor business. This firm failed in May, 1881, owing about $200,000.00. Martin married Carrie E. Wolf, his present wife, in Terre Haute, Indiana, on January 10, 1881, she then being about eighteen years of age, and he about forty six years of age. She had left school about two months before her marriage, and had no property whatever, while he was at that time a member of the firm of Lawrence & Martin.

A little more than two years after his failure, Martin and one Campbell invented, or became interested in, a gambling device known as "Skakel's clock." They rented a room in a building called the "Exchange Building" in an alley running from Clark Street to LaSalle Street between Washington and

Madison Streets in Chicago, and, after fixing it up, set the clock up there and ran it, "playing against the clock." The clock was operated, and the business was run as a "bucket-shop." After about two months a corporation known as the "Phoenix Grain and Stock Exchange" was organized, under the advice of an attorney, in the manner hereinafter explained. The operations were conducted in the room in the alley from some time in the summer of 1883 until January, 1884, when a new place was rented in the Brevoort House on Madison Street, where there was a room "large and well furnished" in the rear of the hotel office. Here the "clock" was kept, and the market quotations, obtained by means of tickers, were "posted every few seconds upon a black board."

In regard to this clock one witness says : "I met Mr. Martin one day, and he told me that he had gotten up a patent right for markets, and he had a model;  *  *  *  it was an automatic machine that made market reports of grain, stock and provisions. Mr. Martin went to see a lawyer;  *  *  * then we put it into effect and it did work; it went on and did business.  *  *  *  The business was carried on by the company the same as a bucket-shop, where people bought and sold stocks, or grain, or pork; that is, the orders were put in and signed by the customers the same as in any bucket-shop. That is what they called legitimate;  *  *  *  as the machine worked the weights moved the cards up; this machine was used to make market reports;  *  *  *  if the grain or stock showed an advance, the man who bought would win; if it went down he would lose;  *  *  *  the quotations were shown on the dial, right in front of the room, where everybody would see it; cards sprang up; the cards were put in every morning in a box; from the automatic machine the quotations were put on a blackboard; we did not get the genuine quotations from the Board of Trade while we were in the alley, but we did after we moved to the Brevoort House; in the Exchange Building there was no business done except with the clock; I managed

the business done on the clock; had about 7 or 8 men helping me; it ran about six hours per day continuously; it never could stop; speculators were always around the clock; the house was always full; * * * some days the business ran $400.00 or $500.00, some days $1600.00; * * * the clock never failed to show fluctuations." Another witness, speaking of the clock, says: "It was to take the place of a faro-box. * * * I leased the basement to Martin and Campbell—a verbal lease; that was in the latter part of the summer; * .* * as soon as they rented they went right in; it took quite awhile before they had it fixed up; I was there almost every day; I saw no business done there except playing against the clock." The operations of this clock have been thus fitly described: "The quotations on the blackboard were determined by the chance operation of the clock instead of any actual sales of the particular article in the market, and each deal was in essence and effect a bet, as to what the next card that issued from the clock bearing the name of the article dealt in, would show." *(N. Y. and C. Gr. and Stock Exchange v. Mellen,* 27 App. Ct. Rep. 556.)

In order to give an appearance of legality to the betting and gambling, which it was proposed to carry on by means of the clock, steps were taken to form the corporation already referred to as the "Phoenix, Grain and Stock Exchange." License to organize it was issued by the Secretary of State on August 28, 1883, to Morris T. Martin, Charles L. Campbell and James H. Wolcott, the capital stock to be $300,000.00 in 6000 shares of $50.00 each, Chicago to be the principal office, and the stated object being "to buy and sell stock, grain and provisions on commission." On September 7, 1883, the commissioners reported the following subscriptions: Charles L. Campbell, 1000 shares, $50,000.00; Emma F. Campbell, 2000 shares, $100,000.00; Carrie E. Martin, 3000 shares, $150,000.00, and that, on the same day, the subscribers met and elected five directors, among whom were said Martin,

Campbell and Wolcott. On the same day the directors met and elected Campbell, President, and Martin, Secretary and Treasurer.

It is not pretended, that Mrs. Martin ever paid more than $500.00 upon her subscription for 3000 shares, that is to say about 16 cents upon each share. It is claimed that the sum of $500.00 which she is said to have thus paid, was her own money. On September 7, 1883, she had no property or money; was only 20 years of age; had a young babe 8 months old; and knew nothing about the business of her husband except what he and her lawyer told her. She is alleged to have borrowed the $500.00 in question from one Skakel on that day, and to have given him her note for the $500.00, secured by a pledge of her jewelry. She says, that she gave the $500.00 at once to her and her husband's lawyer, who had suggested the organization of the corporation and organized it, and in whose office its records and books were kept and all the meetings of its officers were held. Skakel was "in the pool business—book making on the race tracks." He was an intimate friend of Martin, and the two had known each other for 15 or 20 years. He says, that he had implicit faith in Martin, and had been in the habit of lending him money at different times without even keeping an account of it. Martin suggested to his wife to borrow the money of Skakel, and introduced the latter to her, and was present when Skakel handed the money to her. Testifying in the United States Court on October 10, 1888, she had spoken of giving the note, but had said nothing about the pledge of the jewelry; testifying in the State Court on February 13, 1889, after talking with her lawyer, her husband and her brother, and after learning the result of the suit in the U. S. Court which was adverse to her husband, and after reading the briefs of counsel therein, she says she handed Skakel her jewelry, consisting of her earrings, lace pin and two rings, to secure the note. The two rings and the ear-rings had been given her by her husband.

Skakel gave her no receipt for the jewelry, nor any writing of any kind to show that he held it as collateral to his debt. He does not remember how long the note ran, but thinks that it ran a year. He says, however, that it was paid in May, 1884, out of the business, and the amount of the payment was charged up to her.

Some of the proof tends to show, that Skakel was a stockholder in the said corporation from the beginning, and that some of the stock held in the name of Campbell and his wife belonged to him. However this may be, he was the owner of one half of the stock, that is to say, of all the stock subscribed for by Campbell and his wife, as early as January 1, 1884. He was with Martin in the business done with the clock and by the bucket shop.

Under the state of facts thus detailed, it is difficult to understand why Martin did not himself borrow the $500.00 in his own name, if the fact of his indebtedness to the amount of $200,000.00 did not suggest the name of his wife as a cover. Evidently Skakel would have loaned him the $500.00 without any security at all. His wife took no part in the business or in the affairs of the corporation; she never went at all to the room in the alley; she was seen only a few times in the room in the Brevoort House, and then went there only for the purpose of speaking to her husband. The loan to her of $500.00 made under the circumstances above set forth is the only basis for her alleged interest in the gambling enterprise herein described. Because of such loan, the immense amounts of money, accumulated in that enterprise and invested in property in her name, are claimed to be the outcome of her capital and her business.

The proof shows, that Martin was the manager and controlling spirit in all the operations with the clock and in the bucket shop. The original lease of the room in the alley was taken in his name and not in that of his wife. On December 18, 1883, the letters patent for the clock, describing it as an

"improvement in machine for manipulating cards or tickets for creating value," were issued to Campbell and Martin, and not to Mrs. Martin. Martin was the secretary and treasurer. The cash was turned over to him. He kept the book where the winnings and losses were recorded. An account was kept at the Union National Bank, and the book of that Bank, showing the signatures of the parties entitled to draw checks, contains the words: "M. T. Martin, Treas." The two blooded horses, which were exchanged for the Park Manor property, were registered in the "Trotting Horse Register" as "owned by Morris T. Martin, Chicago," and this registry was made in pursuance of statements given by Martin, or under his direction.

The profits or accumulations of the business were not the natural increase from the investment of his wife's money, but rather the product of his own shrewdness and skill as a gambler. Out of the money thus won by his wit the very note, which his wife gave to Skakel, was paid. If there was a *bona fide* loan from Skakel, the loan was made for his benefit, and he discharged the debt created by it.

No such business as was authorized by the corporate license was done. No stocks, grain or provisions were bought or sold on commission. Two kinds of business were carried on; one was betting against the clock, and the other was trading in options on grain, pork, lard, oil, etc. Both of these were illegal and forbidden by the statute, and both were carried on by Martin. The corporate organization was therefore a mere cover to hide the illegality of the gambling operations. The money claimed to have been borrowed by the wife was invested in the purchase of stock in a corporation formed to buy and sell grain, etc., on commission, and not in the illegal business carried on by her husband. Therefore the profits of the latter business could not have resulted from her investment.

But even if she had an interest in the business of trading in options, the clock and its earnings were his property and not hers. The patent for the clock was issued to him and Camp-

bell, and Campbell had assigned to him all interest therein so far as Illinois was concerned. The proof shows that the earnings from the clock were equal to, if they did not exceed, the profits from the other branch of the business. If Mrs. Martin had money invested in the enterprise, her husband had a patent right invested therein. If the business was not exclusively his, at least he and she would be partners. But, while certain phases of the testimony would lead to the conclusion that there was a partnership if it should be assumed that a portion of the money invested in the business belonged to Mrs. Martin, we yet think that there is no sufficient basis for any such assumption. We are of the opinion, that the $500.00 borrowed of Skakel, which is the only money claimed to have been invested by her, must be regarded as having been borrowed by Martin for himself in his wife's name, and that the money invested in the property in question was his money.

A creditor's bill was filed by other creditors than those who are appellants herein in the Circuit Court of the United States against Martin and his wife, and much of the same testimony which is in the record now before us was there brought under review. In deciding that case, Judge Blodgett uses the following language : "It appears, from the proof in the case, that the defendant, Carrie E. Martin, holds the title to the real estate in question, and that all the real estate was paid for with money earned in the business of the Phoenix Grain and Stock Exchange, a 'bucket shop' concern, in this city, of which the defendant Morris T. Martin was the manager. Mrs. Martin never invested any money in this corporation. She became a subscriber to one-half of the capital stock of the company at the time it was formed. She borrowed, as the proof shows, from one of the stockholders the sum of $500, which was all the money that was ever put into the business, as far as the Martins were concerned. From the earnings of this business, the business which was conducted by Martin as its manager, the real estate in question was bought and paid

for, the title simply being taken in the name of Mrs. Martin. The defendant, Morris T. Martin, being in debt to the complainants at this time, I do not think he could secrete his earnings in the name of his wife to the delay or in fraud of his creditors; this is property that has not been earned or acquired by any effort or instrumentality of Mrs. Martin, nor is it the outcome of any investment by her, but it has been accumulated solely by the shrewd conduct and business ability of Morris Martin himself."

Many other circumstances are disclosed by the evidence, the notice of which would extend this opinion to too great a length. For the reasons here stated, the judgment of the Appellate Court and the decree of the Circuit Court are reversed, and the cause is remanded to the Circuit Court for further proceedings in accordance with the views herein expressed. *Judgment reversed.*