## W. F. Johnson & Company, Appellant, v. C. C. Christie, Defendant; Edna C. Christie, Claimant, Respondent.

### Kansas City Court of Appeals, February 20, 1899.

1. **Fraudulent Conveyances:** GIFT TO WIFE FOR BENEFIT OF HUSBAND. Where, as in this case, it appears that stock in a corporation was given to a wife by a third party as a pretense to protect the husband from his creditors, the transfer will be fraudulent as to such creditors.

2. ———: HUSBAND AND WIFE: HUSBAND'S AGENCY. The wife can make the husband her agent to manage her separate property, and the increase and profits thereof under his management can not be subject to his debts.

3. ———: ———: SKILL AND LABOR OF HUSBAND. An insolvent husband can not give to his wife the result of his skill and labor in excess of a proper support though she can employ her husband for a consideration as she could a third person.

4. ———: ———: BUSINESS A DEVICE FOR FRAUD. A husband under the guise of managing his wife's business can not keep from his creditors the profits and income of the business which is really his own, and it will always be a question of fact to be closely scrutinized, whether the business is his or his wife's, even though the business is done with his wife's capital and in her name.

*Appeal from the Jackson Circuit Court.*—Hon. J. W. Henry, Judge.

REVERSED.

GRANT I. ROSENZWEIG for appellant.

Where a wife receives a gift of a corporate name and the insolvent but experienced husband proceeds under that name to increase its value $10,000 and more, by the accumulation of property due to his skill, etc., and in excess of reasonable

support for family in the interval, the corporate shares may be levied on by his creditors. Otherwise he might so operate throughout his whole life, without any incentive ever to accumulate for himself or creditors. The form of drawing more or less regular salary (which is by law exempt) does not change the legal effect. Kramer v. McCaughey, 11 Mo. App. 426, 433; Bump, Fraudulent Conveyances, 247-252 and 254; Coon v. Rigdon, 4 Col. 275, 283; Wilson v. Loomis, 55 Ill. 352; Penn v. Whitehead, 12 Grat. (Va.) 74; Trapnell v. Conklyn, 37 W. Va. 242; Glidden v. Taylor, 16 O. St. 509; Penn v. Whitehead, 17 Grat. 503, 512-526; Backer v. Meyer, 43 Fed. Rep. 702; Grover v. Alcott, 11 Mich. 470; Halburt v. Jones, 25 Cal. 225; Commonwealth v. Fletcher, 6 Bush. (Ky.) 171; Keller v. Meyer, 55 Ga. 406; Bank v. Sprague, 20 N. J. Eq. 13; Quidorf v. Pergeans, 18 N. J. Eq. 472; Hamill v. Augustine, 81 Ia. 302; Schlitz v. Ester, 86 Hun. (N. Y.) 22; Keeney v. Good, 21 Pa. St. 349, 354; Boggers v. Richards, 39 W. Va. 567; Guill v. Hanny, 1 Bradw. (Ill.) 490; Card v. Robinson, 2 Bradw. (Ill.) 19; Kirby v. Bruns, 45 Mo. 234; Lins v. Lenhardt, 127 Mo. 271, 287; Franklin v. Gummersell, 9 Mo. App. 84, 90; Alt v. Bank, 9 Mo. App. 91, 95; State ex rel. v. Martin, 77 Mo. 670; Pawley v. Vogel, 42 Mo. 291.

HARKLESS, O'GRADY & CRYSLER for respondent.

(1) Where property comes to the wife by gift, under our statute, even though the husband may by his services, under salary from his wife, increase the value or income thereof, a prior creditor of the husband can not, under execution, sell the same to satisfy the debt of said creditor. R. S. Mo. 1889, sec. 6869, p. 1610. (2) But even if the creditor would have any right to the increased value of the property of the wife, which she may have received by gifts, because of her husband's labor and services in increasing its value, yet it could not be reached by this kind of proceeding, but a court of equity only could go into the question and make equitable division of it

in accordance with equitable rights, but in a law proceeding like this where they seek to sell the entire certificate of stock they must prove that the title to that certificate of stock sought to be sold is in the execution debtor, and the question as to whether the husband may have increased that stock in value by his services is wholly immaterial to this proceeding.    Mc-Guire v. Allen, 108 Mo. 408.

ELLISON, J.—Plaintiffs are judgment creditors of C. C. Christie and had an execution levied upon a certificate for two hundred and forty-nine shares of stock in a "commission company," an institution engaged in what is commonly known as a "bucket shop" business in Kansas City.    The stock levied on may be said for the purposes of this case to be a reinvestment of profits made in a similar institution theretofore existing, known as the W. A. Michael Commission Company. Edna C. Christie, who is the wife of C. C. Christie, the judgment debtor, made claim to the stock as her individual and separate property.    On a trial of the issue thus tendered the trial court found for her and plaintiff appealed.

The facts of the case are substantially as follows:    Michael had been engaged for several years in the same business, Christie being his assistant and manager.    He and Christie were close friends.    The latter was insolvent and he was aware of it.    He merely knew Mrs. Christie and was under no obligation to her. But the business being very profitable and he having made out of it, as he states, as much money as he wanted, being something more than $100,000, transformed the business into a corporation, the W. A. Michael Commission Company, referred to above, with a capital stock of $30,000, all owned by him except two shares, which were placed, formally, in the name of others for the purpose of organization.    Michael then withdrew all the cash and assets from the corporation and made a present or gift of the stock to Mrs. Christie.    The business was thereafter continued with Christie as sole man-

ager, handling all moneys, depositing in and checking out of banks. In fact, Mrs. Christie having nothing to do with the business and knowing nothing whatever about it. She was not called as a witness in the case. Christie testified that there was an understanding when he took charge of the business for Michael, the latter was to give him an interest in the business if it prospered. (It is conceded that it did prosper.)

This was in part payment for his services. He testified that "the salary was an agreement of this kind: That I should draw enough money to pay my grocery bill and house rent and take the management of this office, and if the business grew, that some time in the future he would give me an interest in it, or something to that effect. There was no written agreement between us." When shown a letter written by him to Michael in which he refers to having *read* over the agreement between them, he said: "I meant we had an understanding and a memorandum, perhaps, in regard to the profits from time to time, which that letter tries to explain. We had no written contract, that I have any recollection of that bound Mr. Michael to anything." He further said that the agreement referred to in the letter was "a little memorandum; some little paper that he and I had made together, perhaps. If there was a written contract between Mr. Michael and me, I have no recollection of it." Other letters, together with his testimony, demonstrate conclusively that he did have an agreement with Michael whereby he had, or was to have, an interest in the concern which he says was afterwards given to his wife. In his letter of June 16, 1896, referring to accounts between them and of a contract "with me," he says that an item of $60 expenses in organizing the W. A. Michael Commission Company should be paid by Michael. When it is remembered that this was the company organized, as claimed, for the purpose of being given to Mrs. Christie and that it was a gift of a business with an earning capacity of $10,000 a month, as he himself stated,

it becomes amazing how he could have objected to paying that sum to his wife's benefactor for putting the gift in shape to be presented. When asked if he objected to paying this, although it was "a donation and a present of a business earning $10,000 a month?" he answered "Yes, sir; I was objecting to it."

He further testified that the reason 'Michael gave the stock to Mrs. Christie was because Michael knew he was insolvent, "and was desirous of helping Mrs. Christie *and myself; we had been friends for twenty years.*" Michael testified that he gave his stock to Mrs. Christie: "Simply because I desired to help *them* and I knew Mr. Christie could not hold any stock in his own name at all; he was insolvent and I didn't propose to make any present to his creditors." That he and Christie had been in business a great many years, *"and he is my very best friend."* The whole of the evidence is consistent with the foregoing and from it, it seems perfectly clear that the moving cause of the gift was in compliance with an agreement that he would give him an interest in the business in consideration of his services, and that it was made to Mrs. Christie to protect it from the creditors of her husband. The evidence leaves no doubt that calling the transfer of the stock a gift to Mrs. Christie, was a pretense. In such circumstances it follows that the stock is liable to the execution, and the judgment should be reversed. In our opinion the trial court pronounced the wrong conclusion of law on uncontroverted facts and it becomes our duty to declare the proper judgment.

2.    But even if the evidence was not as comprehensive as stated, there is another ground which fixes a right in these judgment creditors of Christie to subject a large part, at least, of the earnings of the stock or business, to the payment of their claim. Though, as the proceeding which plaintiff has instituted will, if carried out, result in a sale of the stock

FRAUDULENT conveyances: gift to wife for benefit of husband.

itself, a question arises whether, in that view of the case, the proper remedy has been pursued. The ground referred to is the one argued at length by plaintiffs' counsel. It is this: That the gift of the stock to Mrs. Christie was of the stock without a dollar of capital behind it, since that had been drawn out by Michael; and that the large earnings and profits of the stock were the result of Christie's skill and labor, which he could not cover from his creditors. Here, counsel for Christie interpose the statute of this state, which reads as follows: "All real estate and personal property, including rights in action, belonging to any woman at her marriage, or which may have come to her during coverture, by gift, bequest or inheritance, * * * shall, together with all income, increase and profits thereof, be and remain her separate property and under her sole control, and shall not be liable to be taken by any process of law for the debts of her husband." R. S. 1889, sec. 6869.

It has been held by high authority that the wife may make her husband her agent to manage her separate property and that the increase and profits thereof under his management can not be subjected to his debts. Bank v. Guenther, 123 N. Y. 568; Voorhees v. Bonesteel, 16 Wal. 16, construing statute of New York; Aldridge v. Muirhead, 101 U. S. 399, construing statute New Jersey; Tresch v. Wirts, 24 N. J. Eq. 124; Bank v. Merrill, 81 Wis. 151. This is also stated to be the law by Wait on Fraudulent Contr., sec. 303.

*——: husband and wife · husband's agency.*

Yet while this is true, it must be remembered that a debtor can not make a gift of property to the hindrance of his creditors. The only difference between a debtor husband making a gift to his wife and to any other person, is that he owes her the duty of support of her and their family. Beyond that he can no more give to her, as against creditors, than he could to a stranger. To hold otherwise would be to overturn the law as to voluntary settlements by insolvent debtors. The

insolvent husband can not give to the wife the result of his labor and skill in excess of proper support, no more than he could give her any other property. What could be more unreasonable than to say that a debtor husband can not give his wife a tract of land valued at, say, $5,000, but that he can give her his earnings amounting to that sum? It is said in some cases cited above, that a creditor has no lien on the husband's labor and that he has no right to compel him to work. That is very true, but if he *does* work, the result thereof, after support of the family, should go to his creditors. But the wife, being a *feme sole,* in her property rights, may *employ* the services of her husband for a consideration as she would that of a third person.

So it therefore comes to this, that while the wife is entitled to the increase, income and profits of her separate estate

——: ——: skill and labor of husband. and may employ her husband as her agent to manage the business for her and thereby become entitled to the result of his skill and labor in that behalf, yet it must appear that it is *her* business and not a device to keep from his creditors the profits and income of a business which is really his own. It is a question of fact whether the husband is really managing the wife's business, or is merely carrying on his own. Lachman v. Martin, 139 Ill. 450; Ladd v. Newell, 34 Minn. 107; Knapp v. Smith, 27 N. Y. 277; Osborne v. Wilks, 108 N. C. 651. In Boggess v. Richards, 39 W. Va. 567, it is held that while the wife may employ her husband as her agent to manage her property, yet the profits, above support of the family may be apportioned between the wife and his creditors. Though it is not clear from that case whether the court considered the husband as doing business for *himself* in the name of the wife and with her money, or whether he was transacting *her* business. But whatever may be said of that and similar cases, it seems logical, that if the wife is a *feme sole* as to her separate property and may contract with her husband as

with any one else, she will be entitled to the result of his labor and skill just as she would were he some third person employed by her.

It ought, however, to be distinctly understood that it does not follow because the business is done with the wife's property, or on her capital and in her name, that it is necessarily her business. Such transaction between husband and wife, on account of the ease with which imposition and fraud upon creditors may' be practiced, should be closely scrutinized.

It is therefore necessary to ascertain from the evidence whether, though Christie was operating with his wife's stock given her by Michael, he was conducting the business for her, or for himself. We are of the opinion that, manifestly, the latter is the condition developed by the evidence. In the first place Mrs. C. knew nothing about the business and had nothing to do with it. She never gave any direction about it and never took any interest in it, and, as is conceded, she did not have a dollar invested in the business. The very large profits which were made never came to her in the shape of dividends. He used a portion of the profits to pay his individual debts. Christie kept everything himself, though professedly as her agent, and the whole profitable result was not the result of an investment of her capital, but the result of his labor and knowledge of the peculiar business in which he was engaged.

In Lachman v. Martin, 139 Ill. 450, we find a case in some respects like the one at bar. It involved a similar sort of business run by a husband ostensibly as his wife's agent. The wife there, like the wife here, had no investment in the business and knew nothing about it, or its management. There she went through the pretense of borrowing $500, which her husband was to use, but it was paid out of the business. There the husband, as in this case, was the manager and absolute controller of the interest pretended to be in his wife. The court among other things, said that, "the profits

or accumulations of the business were not the natural increase from the investment of his wife's money, but rather the product of his own shrewdness and skill as a gambler."

But it is said that Christie was paid a salary which, it is contended, shows that he was employed and that the business was hers and not his. It does not follow that if a salary is paid the husband, the arrangement between him and his wife may not be a device to protect a business which is really his, though nominally another's. Indeed the evidence as to his salary leads to the conclusion —: —: business a device for fraud. that the scheme was a ruse to protect himself against the claims of those to whom he was indebted. When we consider his pretense was that he was an agent of a principal to whom, of course, he should render account, his testimony in that behalf was remarkable. He did not seem to know what salary he was getting and was wholly indefinite as to what it amounted to. He did not know what it amounted to from May, 1896, to April, 1897, though it should, at the time of his testimony, have been fresh in his mind. When asked to tell about what his salary was, he answered: "I *think* a part of the time I got $300 a month; part of the time *perhaps* $500 a month and *perhaps* $750 a month." At another portion of his testimony he said that: "My salary varies with the business; sometimes it is more and sometimes less. It would average about $600 a month, I think." At another time he stated his maximum salary was $1,050 a month. It was not shown whether he got a per cent of earnings, and if not, it does not appear who allowed him this salary, or with whom he struck the many bargains about it as it varied from time to time. The true explanation of this is that he never had any salary except as he conceived it in his own mind.

With the concurrence of the other judges the judgment will be reversed.