EAST ST. LOUIS ICE & COLD STORAGE COM-
PANY, COLUMBIA BREWING COMPANY and
L. FRANK OTTOFY v. HERMAN H., *alias*
HERMAN, KUHLMANN; LILLIAN, *alias*
LILLIEAN, KUHLMANN, his wife; JOHN A.
TORNHAGEN, ALBERT C. GEHNER, Trustee,
and AUGUST GEHNER, Trustee; The KUHL-
MANNS, Appellants.

Division One, December 23, 1911.

1. **HUSBAND AND WIFE: Rights of Creditors: Fraud: Scrutin-
izing Transactions.** The law recognizes as primal the duty
of a husband to support his wife and children, though in so
doing his creditors suffer. But the paramount duty which the
law lays upon the husband to support his family must not be
used as a cover for fraud against creditors. Because the inti-
mate relation of husband and wife affords a convenient oppor-
tunity for fraud on creditors, property transactions between
them will be discriminatingly scrutinized when questioned by
creditors.

2. ————: ————: **Voluntary Conveyanec.** A voluntary con-
veyance of land by an insolvent husband to a wife, which,
being without consideration, amounted to a mere gift, is subject
to a judgment then existing against the husband and to his
other debts about to be put into judgment. Such a conveyance
is in fraud of the rights of his creditors.

3. ————: ————: ————: **Trust Property.** Where a dying
wife conveyed her real estate to her husband, and he traded
it for a farm, and then the farm for city property, putting the
title of the city property in a second wife, all the deeds being
absolute on their face, without any limitation or condition, he
cannot, when his creditors ask that the city property be sub-
jected to the payment of their judgments, maintain that the real
estate conveyed to him by his first wife was in trust for the
use of her children, and that the city tract conveyed to him
by his first wife was in trust for the use of her children, and
that the city tract conveyed to his second wife was impressed
with that trust. Such a contention amounts to an attempt to
escape fraud upon creditors by confessing a fraud upon the
children of the first wife. Besides, as they are not parties
their rights are not in court for adjudication.

Ice & Cold Storage Co. v. Kuhlmann.

4. ———: ———: As Agent for Wife: His Capital: Equitable Title. Where a husband deals on his own capital there is no room for an agency. The capital being his, the money made in trading on it is his, and though all the checks used by him in his business were signed by him as her agent and the bank accounts were kept in her name, yet the agency being a sham and a pretense, the property bought with such money, though the title was taken in her name, is subject to his debts. Since he paid the consideration she stands charged in equity with a trust in his favor, and that equitable title is wide open to his creditors.

5. PLEADING: Objection: At Beginning of Trial. An objection to the introduction of testimony on the ground that the petition does not state a cause of action should be made at the first opportunity. It is late if made after some substantial evidence has gone in without objection. Such objection is not allowed the broad office of a timely demurrer.

6. ———: No Cause of Action: Oral Objection at Trial. If the petition wholly fails to state a cause of action, and is not aided by the answer, an objection thereto may be raised at any time, for then the defects are jurisdictional. But the proper method of raising objections to the petition is by demurrer, and if one is not filed, defendant's objections to the introduction of evidence on the ground that the petition does not state a cause of action, will not be sustained because, of a lack of certainty or definiteness of allegation, nor because of informality in the statement of an essential fact, nor because a cause of action is defectively stated. An objection to the petition made after the trial has begun is tolerated, but not encouraged, because it smacks of ambush and of lying in wait, and therefore every reasonable intendment and fair implication will then be resolved in favor of the petition, and if it states a cause of action, though defectively, the objection will be overruled.

7. ———: ———: ———: Fraudulent Conveyance: No Allegation of Insolvency. Though there be no allegation that defendant is insolvent, yet where no objection is made to the petition until after the trial begins, insolvency will be implied in the allegation of fraud that the conveyance was made to his wife to hinder and delay his creditors and that the judgments have remained unpaid for ten years and will remain unpaid unless the land can be reached.

8. ———: ———: ———: Creditor's Bill: Equity: No Fi. Fa. It is not necessary that judgment creditors, in order to have considered a creditors' bill, asking to have certain lands which had been conveyed to their debtor's wife subjected to their judgments, first issue fi. fa. writs and have the land sold under

their judgments, nor were they obliged to issue *fi. fa.* and search for personal property, where their petition makes allega-tions from which it is apparent that course would be useless. Equity does not require a useless thing to be done.

9. **EVIDENCE: Special Legislative Act: No Objection at Trial.** An objection that certain abstracts of titles were wrongfully admitted because the special and local law making them evidence was not offered in evidence, will not be considered on appeal, if not made at the trial.

Appeal from St. Louis City Circuit Court.—*Hon. Daniel G. Taylor*, Judge.

AFFIRMED.

*Hiram N. Moore* for appellants.

(1) The petition fails to state a cause of action and defendants' objection to the introduction of any testimony should have been sustained. Merry v. Fremon, 44 Mo. 521; Wilkinson v. Goodin, 71 Mo. App. 397; Rinehart v. Long, 95 Mo. 396; Humphreys v. Milling Co., 98 Mo. 542; Implement Co. v. Jones, 143 Mo. 278; Burnham v. Boyd, 167 Mo. 185; Davidson v. Dockery, 179 Mo. 693. (2) The conveyances from Ford and wife to Kuhlmann of the 18th of February, 1897, and from Kuhlmann and wife to Adolph Mast, of date the 24th day of May, 1898, were not legally proven and the so-called certified copies of the deeds were improperly admitted in evidence. If admissible in evidence at all they would have been so by virtue of a local, and special Act of the Legislature contained in the Session Acts of 1905, at page 152, and this act was not introduced in evidence. Kirby v. Railroad, 85 Mo. App. 345. (3) The evidence fails to show a transfer of the property by Kuhlmann with an intent to defraud his creditors, but even if such intent had been shown, the evidence utterly fails to show any guilty participation therein by defendant, Lillian Kuhlmann; or any knowledge on her part at the time from which such intent might be inferred.

*John T. Fitzsimmons* and *L. Frank Ottofy* for respondents.

(1)    The decree subjecting the Madison street property and the Cass avenue property to the satisfaction of the judgments of plaintiffs against H. Kuhlmann was just and equitable and should stand. If Lillian Kuhlmann were permitted to retain these properties without payment of these judgments, a gross fraud upon her husband's creditors would receive the sanction of law. Johnson & Co. v. Christie, 79 Mo. App. 46; Wolfsberger v. Nort and Fritsch, 104 Mo. App. 261; Pomeroy on Equitable Remedies, supplementary to Pomeroy's Equity Jurisprudence, vol. 2, sec. 873, p. 1409. (2) Plaintiffs' petition states a cause of action and defendants' objection to the introduction of any testimony was properly overruled. Reed v. Bott 100 Mo. 62; Jordan v. Buschmeyer, 97 Mo. 94; Bliss on Code Pleading, sec. 211; Lyons v. Murray, 95 Mo. 23; Smith v. Sims, 77 Mo. 269; Nagel v. Railroad, 167 Mo. 89; Bank etc., v. Rohrer, 138 Mo. 369; Dorman v. Hall, 124 Mo. App. 5; Ennis, Admr. v. Padgett, 122 Mo. App. 539; Hoffman v. Gill, 102 Mo. App. 320; Pomeroy on Equitable Remedies, sec. 874, p. 1410. (3) Fraud on the part of Kuhlmann in causing the Madison street and Cass avenue property to be conveyed to his wife by the grantors thereof is conclusively proved. It was not necessary to allege or prove any fraud in fact on the part of his wife Lillian Kuhlmann. The conveyances to her were constructively fraudulent in the absence of a satisfactory showing to the contrary. Jordan v. Buschmeyer, 97 Mo. 94; Johnson & Co. v. Christie, 79 Mo. App. 46. (4) The regularity of the returns of the constable or of the sheriff on the executions is not in point, since no question of title to real estate, depending upon these returns, is in the case. The issuance of executions merely has bearing on the question whether judgment

creditors have exhausted their legal remedies.  Judgment creditors may be entitled to equitable relief without a showing that execution issued for equity does not require the doing of unnecessary things.  In this case, defendant H. Kuhlmann testifies that he has not a cent, hence what use would an execution subserve.  Langford v. Few, 146 Mo. 142; Littlefield v. Ramsey, 181 Mo. 619; Tittmann v. Thornton, 107 Mo. 510; Welch v. Mann, 193 Mo. 32.

LAMM, J.—On May 17, 1907, the Storage Company, the Brewing Company and Ottofy, three judgment creditors of Herman Kuhlmann, united in a creditors' bill, suing him and others in the circuit court of St. Louis, the general nature and object of which suit was to subject two tracts of ground in St. Louis to three judgments aggregating a few hundred dollars. The record title to said tracts was in the defendant Lillian, wife of Herman Kuhlmann.  The bill alleges that Herman, paying the consideration, caused the title to be put in his wife by conveyances made with the intent to hinder, delay and defraud his creditors. At the hearing, *nisi,* a decree going for plaintiffs, the Kuhlmanns in due time and apt form appeal.  The rights of the other defendants (respectively trustees in two deeds of trust in the nature of mortgages and beneficiaries therein) are not infringed by the decree. Accordingly they abide it.

To work a reversal appellants (1) assail the bill, (2) claim error at the trial in admitting certified copies of two deeds offered in evidence by plaintiffs, and (3) contend that the decree is for the wrong party on the merits.

Attending to the facts, the case made is this:

The first tract to be charged is the east half of a certain lot six, fronting twenty-five feet on the north side of Madison street in the city of St. Louis, more

particularly described by metes and bounds in the bill. For convenience let us call it, *passim,* the Madison tract. This parcel stands incumbered of record by a deed of trust securring $1000 loaned the Kuhlmanns in 1904.

The second tract to be charged is three contiguous lots fronting one hundred feet on the south side of Cass avenue in said city, more particularly described by metes and bounds in the bill. For convenience let us call it, *passim,* the Cass tract. It stands incumbered of record by a deed of trust, of date April 15, 1905, securing an indebtedness at the time of the trial of $5,000 purchase money.

There is no dispute but that the value of the Cass tract is $7,700. The value of the Madison tract is somewhat dark. As near as we can make out it may be put at say $2,000 for the purposes of the case.

Kuhlmann's present wife took title to the Madison tract by a deed from one Adolph Mast, of date the 24th of May, 1898. She took title to the Cass tract on April 15, 1905, through a deed from one Becker. Both of these deeds were promptly spread of record. These two conveyances are the ones sught to be opened up so as to let in respondents' judgments as charges on both tracts.

On the 7th day of May, 1906, the Brewing Company took judgment against Herman Kuhlmann, before a justice of the city of St. Louis, for $130 and costs. A transcript thereof was filed in the office of the clerk of the circuit court of said city on the 1st day of April, 1907, showing, *inter alia,* a due constable's *nulla bona* return on a justice execution on December 11th, 1906.

On the 10th day of February, 1899, the Storage Company took judgment against Kuhlmann before another justice of said city for $200. A transcript thereof was filed in the office of said clerk on April

25, 1899, showing *inter alia,* a due constable's *nulla bona* return on a justice execution in May, 1899.

On the 29th of March, 1897, Ottofy took judgment for $100 against said Herman Kuhlmann before another justice of said city, on which execution issued and a due constable's return of *nulla bona* came in thereafter on June 27, 1897. A transcript of this judgment was presently filed in said clerk's office. This judgment was revived in March, 1907, in due form, by a proceeding before the successor of the justice rendering it originally. A transcript of the reviewed judgment, thereafter in March, 1907, was also filed in the office of said clerk. Presently a transcript execution was issued thereon by said clerk, and on March 26, 1907, a levy was made on said Madison and Cass tracts, which execution was returned by the sheriff, on the order of Ottofy, unsatisfied and without sale of the property levied upon. Prior to the revivor, a transcript execution was issued by the circuit clerk in 1900, and in August of that year the Madison tract was levied upon, but, by order of Ottofy, the execution was returned by the sheriff without a sale of the property and unsatisfied.

(*Note bene*: There is no question of homestead raised by appellants, nor does the testimony uncover or tend to establish a homestead right as against the complaining judgment creditors.)

Said judgments from that day to this remain unsatisfied in whole or in part. At the time Kuhlmann's said wife took title to the Madison tract there were other judgments against him, but whether they now are satisfied or outlawed by the flight of time is not disclosed.

It sufficiently appears that from May 24th, 1898 (the date Mrs. Kuhlmann took title to the Madison tract), down to this day, Kuhlmann stood under the flag of insolvency and claimed the protection and immunities peculiar to its folds. Never since has he

carried any real estate in his name. His choses in action then or since existing, if any, disappear as any part of his visible assets, and if they reappear at all they do so apparently as part and parcel of hers. So that he then became and ever since remained independently poor as to his creditors, beggared as to them to all outside appearances, and without a particle of visible property subject to legal process. It sufficiently appears also that if his complaining creditors have any remedy it is in equity. Whether such remedy exists depends on conclusions to be drawn from a close and discriminating judicial scrutiny of the scheme whereby Kuhlmann thenceforth filled the alleged office of agent for his wife and she in turn became apparent owner of all he had, including his then business with all and singular its after earnings and gains for the ten years between 1897 and the date of the trial. Attending to that phase of the case, the facts are these:

Kuhlmann, forty odd years old, has been for twenty-three years, that is, since his majority and arrival in this country, a horse trader. While his headquarters (barring a short interval) were in St. Louis, he was peripatetical, at spells plied his calling now and then in other towns of that region. Twice married, Kuhlmann during his first wife's lifetime did business in his own name. She died, having before her death conveyed a property on Sarah street in St. Louis to him. Presently he married defendant, Lillian, aged twenty. From fourteen years of age up to her marriage, Lillian worked as a domestic on wages. Her mother was a widow living in apartments in the second story of a tenement house. If this widow had any property worthwhile its source is shadowy and it consisted in money kept concealed by her in those apartments. Her family were Lillian, an elder sister (also working out as a domestic) and a brother working on wages, since dead. We gather

that the family was supported by the labor of the children and by sewing the widow took in. After the widow ceased to keep house, as she did presently, she lived with her eldest daughter who had married, paying nothing for board or lodging till she died. Two days after the Christmas of 1897 her daughter Lillian married Kuhlmann. Appellants introduced testimony tending to show that Kuhlmann's fortunes at that time were at low ebb, and that a few days after the marriage Lillian's widowed mother, strongly impressed with her new son-in-law's ability as a horse dealer, produced from some hidden source $750 and presented it to her to go on in the horse trading line. The theory of appellants is that this windfall of $750 became Kuhlmann's subsequent capital in trade as agent for his wife, and there is testimony tending to show on their behalf that she then put this present of money in an iron safe in the house and safely kept it there snug as a bug in a rug for over a year, when she deposited it to her name in a bank on the 28th day of December, 1898. A bank deposit was in evidence for that date for that amount to her credit. We shall recur to this bank deposit later. It has weighty matter in it and on the ownership of that deposit this case turns as on a pivot. There is more testimony on that behalf presently to be considered. There is testimony also tending to show that at once after the marriage an arrangement was made between Kuhlmann and his wife whereby he should ply his calling as a horse trader as the agent of his wife and a sign was put up at their place of business, reading: "H. H. Kuhlmann, Horses Bought and Sold, Agt." From the time of that marriage onward he so ran the business. No bank account appears in Kuhlmann's name thereafter. All funds were banked in hers, but the checks against this account were drawn only by Kuhlmann himself. The plan adopted was this: they got a rubber stamp running as follows:

"Lillian Kuhlmann ........ Attorney." This stamp was kept in her desk, so she says. She would from time to time put that stamp upon a block of blank bank checks and turn these blank checks over to her husband to use at his own will as a horse dealer or otherwise. The signature of these checks when uttered by Kuhlmann was in this form: "Lillian Kuhlmann *by Herman Kuhlmann* Attorney." He dated them, filled in the amount, wrote his name thereto in the blank left by the stamp and uttered them. He rendered no account to her at any time as agent, nor was she consulted as principal in the run of his dealings. He got no commission or pay as agent. He summed up on that score as follows: "All I got is what I got to eat and drink. All I got belongs to her to support the children with." The use of business funds was at all times potentially his, he drew checks as he willed, he made the deposits in his business, retaining out of its earnings and gains such pocket money as he chose, depositing such amounts as he chose and when he chose, subject to the checking scheme above outlined.

The business prospered. Out of its income Kuhlmann, having negotiated for the Cass tract, drew a check of the character indicated in 1905 to pay down the cash payment thereon of $1700. Similarly two subsequent payments, aggregating $1,000, were made. The total purchase price was $7,700, leaving $5000 due, as heretofore said. Kuhlmann had the title taken in his wife's name. So much for the Cass tract.

Recurring to the Madison tract and bringing down the threads of its history, the record discloses this condition of things. Before his second marriage Kuhlmann traded his Sarah street property for a farm of 240 acres in Pulaski county and $600 in cash to boot, in February, 1897. There is an effort to show that this land was "turkey land"—i. e. of little value. But from what follows it is apparent we need make

no investigation or finding on the worth of that farm; for it is not a vital issue in this case. On the 24th day of May, 1898, for an expressed consideration of $4580, Kuhlmann and his codefendant, his present wife, conveyed that land to one Adolph Mast, a butcher of St. Louis. The transaction was not an out-and-out sale for cash, but a swap of properties by Kuhlmann and Mast. Thereby Mast traded to Kuhlmann for his farm in Pulaski county the Madison tract in question and paid boot—the title to the Madison tract as said being taken in the name of Lillian Kuhlmann. As part of that trade Kuhlmann got a grocery store in St. Louis variously estimated as worth from $200 to $1000. This grocery store he also turned over to his wife. As we understand the record, Mast assumed and paid a secured debt on the Pulaski farm of $750 and gave Kuhlmann a note for $800 secured by a deed of trust on the Pulaski farm, which note he afterward paid to him individually on December 28, 1898. In turn the Kuhlmanns assumed a building and loan association debt of $800 on the Madison tract which Kuhlmann subsequently paid out of the income of the horse trading business—in two instalments by checks drawn as indicated heretofore.

Afterwards in 1904 the Kuhlmanns borrowed $1000 on the Madison tract and put that money into the horse-trading business. So much for the Madison tract.

It will be observed as of significance that the date of the Mast payment to Herman Kuhlmann of the $800 note, a balance due him on the Pulaski farm, coincides precisely with the date of the beginning of the bank account, on the $750 item on which appellants rely to show that Lillian Kuhlmann furnished the horse-trading capital of the business Herman transacted as her agent, and on the strength of which she lays claim to not only the *corpus* of the trading capital but to all the gains and profits thereof, part of

which purchased the Cass tract. Herman Kuhlmann testifies that the deposit did not come out of the $800 paid by Mast to him on that day, but was the identical money given by his mother-in-law to his wife a year before. When asked what became of his $800, he testified he used it in educating his children. The Kuhlmanns contradict each other in that behalf and in other particulars. There were warnings given by the chancellor during the testimony of Kuhlmann indicating he was not satisfied with the candor of the . witness—the details of which may as well be omitted.

Going back a little, Mrs. Kuhlmann testified in substance that out of her wages as a domestic she laid up $300 against her marriage day, and that every penny thus accumulated went into the horse-trading business her husband thenceforward carried on as "agent" for her. What outlay, if any, she made for preparation for her marriage out of her girlhood store by way of a wedding outfit she does not tell us.

If there be other facts essential to a determination of the assignments of error they will appear in the course of the opinion.

On such a record, we observe:

I. There was no error in the decree on the merits. This, because:

(a) The law recognizes a primal duty of the husband to honestly support his wife and children, though in so doing his creditors suffer. That rule of conduct in the long run is the best for the State and society. Indeed, long before statute created the right and remedy of a creditor to collect his debt, the law of nature created the right of children and wives to support by the family's head and this law is paramount to any statute law that runneth in favor of creditors; for the latter is but written on parchment by the finger of man while the former was written with "the finger of God in the heart of man." Saith Lord COKE in

Calvin's case (7 Rep., p. 21): "The law of nature is that which God at the time of creation of the nature of man infused into his heart, for his preservation and direction; and this is *lex aeterna,* the moral law, called also the law of nature. And by this law, written with the finger of God in the heart of man, were the people of God a long time governed, before the law was written by Moses, who was the first reporter or writer of law in the world."

The laws of men recognize the paramount office of the laws of nature in that regard, thereto ample authority might be cited if there was need of it.

Nor, whatever the doctrine of olden times or in other climes, does our modern law make a debtor a slave or serf of his creditor, bound to him as such serf or slave by either a legal "cable tow or silken thread." Thereto the rule in equity agrees. Says ALDIS, J., in Daniel Webster v. Hildreth, 33 Vt. 457: ". . . and equity has no jurisdiction . . . to compel men to work for their creditors who may perversely prefer to work for the benefit of their wives and children, and leave honest debts unpaid." That pronouncement is the law of this jurisdiction. [Bank v. Adair, 172 Mo. l. c. 166.]

But the foregoing generalizations go with a grain of salt; for the moral law, recognized by the statute, which lays once for all upon the husband and father the inalienable, paramount and abiding duty to support wife and child, must not be used as a mere cover for fraud against creditors. When fraud comes in at the door all contrivances to consummate it fly out of the window in chancery. Such use of a moral law is but to pollute a chaste hand, and a hand once chaste but now polluted pollutes the gift it fetches. Such use perverts an abstract pious purpose into a concrete iniquitous device. The wise rule in equity is that, since the intimate relation of husband and wife affords a convenient and often-used opportunity and

vehicle for fraud on creditors, transactions between husband and wife in property matters are to be scanned with a jealous and discriminating eye by a chancellor when questioned by creditors, and the very marrow of the matter is to be searched to discern the true intendment of the thing, to the end that it may be held good or bad as just equitable considerations point. [Cole v. Cole, 231 Mo. l. c. 255; Johnson v. Christie, 79 Mo. App. 46.]

(b) Quickened by the foregoing precepts, we conclude the Madison tract is held by Kuhlmann's wife in fraud of his creditors. It is clear she paid nothing for that piece of property. Indeed, as we see it, she makes no showing of parting with aught as a consideration therefor. To the contrary, Kuhlmann paid the entire consideration in his trade with Mast. Kuhlmann held the Pulaski farm subject to his debts. When his wife took title to the Madison tract Ottofy had judgment, and the Storage Company's debt was soon to be put in judgment. The transaction was tantamount to a gift to his wife, and, by operation of law, was void as to creditors as constructively fraudulent. [Jordan v. Buschmeyer, 97 Mo. 94; Cole v. Cole, supra.] We have no doubt it was fraudulent in fact, but we put our holding on constructive fraud.

It was suggested below that the Sarah street property, traded by Kuhlmann for the Pulaski farm, was conveyed to him by his first wife in trust for his children. The idea seems to be that he held the Pulaski farm as trustee for them, hence his creditors had no concern with what he did with it, nor could they follow its proceeds into the Madison tract. But that suggestion springs from an entire misconception of the record. The Sarah property was not conveyed to Kuhlmann subject to any trust express or constructive, but out-and-out, without condition or limitation.

Moreover, the contention comes with ill grace in this case; for it amounts to an attempt to escape a

charge of fraud on creditors by confessing a fraud on the children of the first wife. Thereby blotting out a dark blot with a black one. At the time of the conveyance of the Sarah property, Kuhlmann's first wife was in her last sickness. She made the conveyance through a conduit. During the conversation with her husband at that time, the conveyancer testified she admonished him to treat their children well. Being then about to die, the admonition is alone referable to her motherly solicitude and not to the creation of a trust in land. All parties so construed it; for the deed was written by a competent scrivener who received his instructions from the mouth of the grantor. It was made and accepted in absolute form, and thenceforth the property was dealt with as Kuhlmann's absolute estate. When he traded it for the Pulaski farm he took title free from a trust. He traded that for the Madison tract and put the title to that in a *step-mother* free from any trust. Presently they borrowed money on the Madison tract for horse trading ends. In the face of such disloyalty to a trust, he may not speak for his children and say, when bought to book by creditors, that one exists. His children's rights are not here for adjudication.

(c) Quickened by the same precepts we conclude the Cass tract is held by Kuhlmann's wife in fraud of the three suing creditors. Equity looks to substance not to form. The question is, on one hand: Did Kuhlmann deal as a horse trader on his own capital? On the other, it is: Did he deal on his wife's capital? If on his wife's he may act as her agent, for she has an estate to preserve and manage. The gains are hers, hence the Cass tract purchased by those gains are hers. But if he dealt on his own capital, there is no room for *agency*. His posing as an agent under such circumstances is, necessarily, to be brushed aside as a cobweb of sham and pretence. In equity it furnishes no protection to either. We think

it clear under this record that the claim of agency is a trick and subterfuge, that Kuhlmann is the owner of the capital embarked in his business, and as such owner the gains were his, *ergo* the Cass tract is his. Certainly she can not hold that tract as against his creditors unless she paid the consideration for it, for if he paid the consideration she stands charged in equity with a trust in his favor, she is seized to his use and such equitable title is wide open to his creditors.

The facts already sufficiently appear and speak for themselves in no uncertain tones. The $1000 embarked in the business, the proceeds of the loan on the Madison tract, were clearly his. The business he was conducting at the date of his second marriage was clearly his. It is attempted to excuse the transfer of the grocery store and the Madison street tract to her on the theory her money went into the business. But that idea involves a contradiction. If her money alone went into the business, and that business thereby became hers, why, on that hypothesis, give her the grocery store and the Madison tract? But aside from that, the two items she claims to have put into the business are the $300 she had on hand at her marriage and the item of $750. There was another item, $52, which it is claimed she paid for interest on borrowed money. It was for the trial chancellor to say whether he believed her when she said she put $300 in the business at the outset. It was also for him to say in the first instance whether if she did so, she was not recompensed thereafter when she received the grocery store. But little stress is laid on those items in the brief of her counsel. The matter hinges on the deposit of $750 on the 28th day of December, 1898. Was that money, received from her mother the year before and preserved in an iron safe in her home, her money, or was it the money of Kuhlmann, paid to him on the Mast note on that very day? Under the

contradictions, evasions and peculiarities in the testimony of Kuhlmann and his wife, it would have been a bold chancellor who would find in her favor on that issue. It seems on her theory her husband was shy of money at the outset for his business. By that token he was under the whip and spur of need. Why, then, was it laid away, kept for a year from him, and finally put to his credit the very day he got $800 of his own?

We conclude, as the chancellor below did, that Kuhlmann was doing business as a horse trader on his own money. His course of business for ten years lends color to that conclusion. The testimony shows she knew nothing about horse trading. We are inclined to take judicial notice of the fact that the traditional guile and adroitness of horse trading are of the masculine gender, and might well result in the guile and adroitness of the business scheme disclosed by this record.

The learned chancellor solved his problem correctly on the merits.

II. It is argued the petition is fatally defective. The question arose below at the trial after some evidence had gone in without objection. At that stage an objection was made to the introduction of testimony on the ground the petition did not state facts sufficient to constitute a cause of action. Error is now assigned thereon.

There are two forks to the contention, viz.: First, that the petition does not charge that at the time of the transfer complained of Kuhlmann was insolvent; nor, second, does it aver that plaintiffs have exhausted their remedies at law. There is no substance in the contention. This, because:

(a) An objection to the introduction of testimony is late when made for the first time after substantial testimony has gone in. If to be made at all, the objection is due at the first opportunity. Now the

door of opportunity opens at the trial when plaintiff *begins* to offer proof. But the proposition need not break on so narrow a view.

(b)    An objection at the trial to the introduction of testimony, because the petition is bad, is not allowed the broad office of a timely demurrer. In the science of practice codes a demurrer comes before an answer. The essential object of a demurrer is to avoid issues of fact and in lieu to invoke a trial on issues of law. But when an answer is in and the issues are made up, what does that mean? It means the sifting of pleadings is over and that the line of battle is now pitched on the facts at a trial on the merits. Parties litigant thereby announce ready for trial on the merits. Preparation for trial is invited, and expenses and labor follow. Thereafter and when parties appear in court with their witnesses and the trial is on, a halt of the trial by an objection made to the petition, is tolerated, but not encouraged by courts. It is not encouraged because it smacks of an ambush, of lying in wait, and there is an element of untimeliness and unfairness about it. It is tolerated because an answer does not waive such capital and radical defects in a petition as that it lacks essential averments to a cause of action, and there is no aider by the answer. Such defects may be first challenged in a motion in arrest and it seems they are jurisdictional and may be raised for the first time in this court. [Hanson v. Neal, 215 Mo. l. c. 278.] Hence an objection to testimony on that ground is tolerated. An objection to the introduction of testimony is never sustained because of a lack of certainty or lack of definiteness in allegation, nor for informality in the statement of an essential fact, nor because a cause of action is defectively stated. Such objection is disallowed if by reasonable intendment, or by fair implication from facts stated, or if by most liberal construction the essential allegation may be got at by inference. The

rule to go by in disposing of such objection is the same bland rule applied to ruling on motions in arrest. Wherein the grace of every implication is allowed to aid the verdict, and mere ambiguity in allegation is resolved in its favor.

The several propositions announced lie well within the authorities; for example: Grove v. Kansas City, 75 Mo. 1. c. 675; Young v. Iron Co., 103 Mo. 1. c. 327; Donaldson v. Butler County, 98 Mo. 1. c. 166; Haseltine v. Smith, 154 Mo. 1. c. 413; Broyhill v. Norton, 175 Mo. 1. c. 202; State ex rel. v. Delaney, 122 Mo. App. 1. c. 243; Alter v. Frick, 62 Mo. App. 453; Murphy v. Ins. Co., 70 Mo. App. 1. c. 82, *et seq.*

In the Donaldson case, supra, BLACK, J., comments on the fact that such objection comes after preparation for trial and "too late to deserve a very favorable consideration." In the Delaney case, supra, ELLISON, J., speaks of the right to make such objection as one "which has been expressed to be only tolerated." In the Haseltine case, supra, this court speaks by VALLIANT, J., thus: "While the court is bound to sustain an objection of that kind, even at that stage of the case, if it is well taken, yet it does not look with favor on that practice. The fair way is to challenge the sufficiency of the petition by demurrer in the beginning, and if it is adjudged insufficient and is susceptible of amendment, the fault may be corrected. If a party lies in wait for his adversary the court should not allow him an advantage that he could not have attained in the open field."

In the Young case, supra, the petition did not allege the negligence of defendant brought about the injury. In that predicament, as against an objection to the introduction of testimony, this court blandly looked to an averment in the "prayer for relief" to supply the deficiency.

(c) Applying the principles announced in paragraph "*b*," the petition must be held sufficient as

against the objection in hand. It alleges that Kuhlmann has no other property out of which the judgments can be satisfied; that the judgments remain unpaid; that the conveyances assailed were taken and caused to be made fraudulently to hinder, delay and defraud creditors; that one of the judgments remained unsatisfied for nearly ten years and was then revived by a judicial proceeding; that the title to the Madison and Cass tracts was covered up to prevent the collection of the judgments; and that unless those tracts can be reached to exact payment the judgments must remain unpaid. There is no direct allegation that Kuhlmann was insolvent, but his insolvency is implied in the allegations of fraud, and its existence when the suit was begun sufficiently appears. Fraud could not result except through injury, and injury could not result except through insolvency. There is no direct allegation that plaintiff is remediless at law, but inferentially that allegation is made.

Moreover, where could plaintiffs go except to equity for full and rounded relief against frauds whereby the legal title to Kuhlmann's real estate is held in the name of his codefendant? They certainly were not obliged to issue *fi. fa.*, sell under their judgments and thereafter knock at the door of equity for relief. As they had to *end* in equity they might as well *begin* in equity. They sue to obtain a decree whereby their judgments may become effective. That was a more equitable course for appellants than to have first forced a sale under the judgments, and let the purchaser of such sale then sue to vest title out of the wife and into him. [Welch v. Mann, 193 Mo. l. c. 326, *et seq.*] Nor were they obliged to issue *fi. fa.* and search for personal property. Why do that when the petition makes allegations wherefrom it is apparent that course would be useless? Equity requires no vain and nugatory thing to be done.

We rule the point against appellants.

III.    The court provisionally admitted over the objection of appellants a copy of the deed whereby Kuhlmann took title to the Pulaski farm.    The records of that county were burned and the custodian of "Johnson's Abstracts" supplied a copy by virtue of a special and local law (Laws of 1905, p. 150 *et seq.*). The point made in appellant's brief is that the special act was not introduced in evidence.    But the bill of exceptions shows the act was actually in court and that appellants' counsel read therefrom to the trial judge.    Was that not a waiver of a formal introduction in evidence?

But we do not decide the question.    The point now made was not made below.    The point made below is not made here.    Such mending of holds, and swaps of position will not do.

Moreover, the title to the Pulaski farm was not the issue in the case; it is only involved incidentally. There was proof of Kuhlmann's ownership *aliunde,* and both sides tried the case throughout on the theory he was such owner.    We could not well reverse the decree under such circumstances, for the error, if error it was, is harmless.

The point is disallowed to appellants.

The decree does not vest the whole title out of Mrs. Kuhlmann.    It merely makes her title subject to plaintiffs' judgments and makes them a charge on both tracts.    Payment will execute the decree and payment out of them both is plaintiffs' equitable right.

Wherefore the decree is affirmed.    It is so ordered.    All concur.