## PORTER A. THOMPSON v. E. M. LINDSAY and HETTIE LINDSAY, Appellants.

### Division One, March 29, 1912.

1. **PLEADING: Cause of Action: Objection at Trial.** An objection that the petition does not state facts sufficient to constitute a cause of action, made for the first time at the beginning of the trial, comes late, and the bill is entitled to every reasonable intendment and implication in its favor.

2. **CONTRACT: Construction.** The proper construction of a contract arises on the whole subject-matter—parties, their relations to each other, the object to be conserved by it, and the language used.

3. ————: ————: **To Pay: To Buy.** A contract by a purchaser of a lot to pay an existing outstanding taxbill is not a contract authorizing the seller to purchase that taxbill.

4. ————: **To Purchase Lot: To Pay Special Tax Bill: Amount at Which Suit Thereon is Compromised: Illegal Deed of Trust: Redemption.** The purchaser of a town lot paid a small amount in cash, and agreed to pay the balance in monthly installments, and to pay a special tax bill for street grading, and was to have a warranty deed when all was paid. The contract further gave the seller the right and option, at any time before payment in full was made, to put a deed of trust upon the lot for the

amount unpaid on said contract, with usual commissions and expenses, to receive the proceeds of the loan, and thereupon to execute to the purchaser a warranty deed with a provision therein that the grantee assumes the payment of such loan. At the time the contract was made there was a special taxbill which had been outstanding and unpaid for three years, and in suit for over a year, and that bill the seller had disputed as being void, but two years later he compromised the suit by paying sixty per cent of the principal. He then demanded of the purchaser payment of the whole, with ten per cent interest from its date, and on the purchaser's failure to pay, he made a deed of trust on the lot for the balance of the purchase price unpaid and for the amount of the taxbill with interest, etc., and made a warranty deed to the purchaser, and when the semi-annual interest on the amount became due and was not paid had the property sold and bought it in in the name of his mother. *Held*, that a contract to pay the taxbill did not mean a contract to buy it; and to interpret the contract to mean that the seller could fasten the whole of the disputed taxbill, principal and interest, upon the purchaser, would be to make it a trap to catch the purchaser. What the contract meant, when it said the purchaser agrees to pay the taxbill, was that the purchaser should bear the burden of defending the suit then pending on the taxbill. And this view is strengthened by its other provisions that if the seller paid any taxes or liens the amount so paid was to be reimbursed to him at eight per cent and distributed throughout the monthly installments, and if he exercised his option to borrow money on the lots the amounts paid by him on liens and taxes should merge in the amount of the loan to be secured by the deed of trust and assumed by the purchaser. The seller was entitled to demand only the amount at which the taxbill was compromised, and the illegal excess carried by him into the deed of trust tainted it and the consequent trustee's deed with illegality.

5. **TRUSTEE'S SALE: Purchaser: Alter Ego: Notice of Illegality.** Where the deed of trust is illegal, a purchaser with notice of its illegality takes subject to be divested of what the sale brought her; and a mother of the seller of the property, who, under a contract of sale authorizing him to place a deed of trust thereon for the amount of the deferred payments and all liens and taxes paid by him, carried into the deed of trust such illegal excesses as tainted it with illegality and, without receiving any money from her, made the note to her and then procured foreclosure and purchased the property in her name, takes with full notice.

6. ———: **Loan: None In Fact: Sale.** Where the contract of sale of a lot contemplated a real loan by the seller to pay the deferred purchase price, and no loan in fact was made, a deed

of trust given by him to secure the fictitious note is a mere shell, and a sale thereunder to a purchaser with notice was made subject to the equitable right of the purchaser of the lot to redeem—unless that right is defeated by estoppel or some other equitable or legal ground.

7. **ESTOPPEL: Not Pleaded.**  Estoppel to be available usually must be pleaded.

8. ————: **Change in Situation.**  The facts relied on by the party as constituting estoppel, as a general rule, must have caused him to change his situation or in some way to suffer detriment or loss by reason of such reliance.  One who voluntarily takes the wrong road and travels it to the end cannot urge that his adversary is estopped to claim his legal rights.

9. **NEGLIGENCE: Delay in Bringing Suit: Inattention.**  Negligence that bars equitable relief may be stated thus:  No man is entitled to the aid of a court of equity when that aid is made necessary by his own fault.  But where plaintiff was guilty of no negligence at the outset, and defendant undertook to fasten upon him an illegal demand for money, and when he would not yield thereto, defendant under an unwarranted construction of a contract existing between them undertook by means of a fictitious deed of trust to get possession of his property, plaintiff is not to be charged with negligence because he did not bring suit at once, but out of a slovenly inattention to business waited a whole year before appealing to a court of equity to redress his wrongs.

10. **STATED ACCOUNT: Not Pleaded.**  The doctrines applicable to an agreed and stated account are not available unless the issue is pleaded.

11. **EJECTMENT: Res Adjudicata: Illegal Deed of Trust.**  A judgment in ejectment, after foreclosure under an illegal deed of trust, which, with the consequent sale, is attacked by the equitable suit to set aside, is not *res adjudicata* where no equitable defense was pleaded.

12. **SETTING ASIDE DEED OF TRUST: Restitution and Rents.**  Where a cause is in equity and there is a prayer for general relief, the chancellor should give rounded and perfect relief, although that relief may embrace matters cognizable at law.  Where the suit is to set aside an illegal deed of trust and a consequent illegal sale, under which defendant, with full notice, got possession, the decree awarding plaintiff possession and rents will not be disturbed.

13. ————: **Interest.**  Where plaintiff, who lost possession of the real estate by reason of a foreclosure sale of an illegal deed of trust, was yet nevertheless indebted under his contract of

purchase for a part of the purchase price, made no tender that would stop the running of interest, he should pay interest according to the contract as the price of his decree.

Appeal from Buchanan Circuit Court.—*Hon. H. M. Ramey,* Judge.

REVERSED AND REMANDED (*with directions*).

*Kendall B. Randolph* for appellants.

(1) The court erred in overruling the defendant's objection to the introduction of any evidence on the part of the plaintiff, made before any evidence was introduced, on the ground that there was no equity in the petition, that no cause of action was stated in the petition. Mulholland v. Rapp, 50 Mo. 42. (2) Negligence amounting to a breach of duty supplies the place of intent. Green v. Smith, 57 Vt. 268; Pence v. Arbuckle, 22 Minn. 417; Hardy v. Bank, 51 Md. 562; Bank v. Hazard, 30 N. Y. 226; Horn v. Cole, 51 N. H. 227; Kingman v. Graham, 51 Wis. 232; Brant v. Coal Co., 93 U. S. 326; Cornish v. Abington, 4 Hurl. & N. 549. (3) All the parties to a deed are estopped from denying the recitals therein. Dickson v. Anderson, 9 Mo. 156; Clamorgan v. Greene, 32 Mo. 285; Taylor v. Saugrain, 1 Mo. App. 312; Skinner v. Stouse, 4 Mo. 93; Smith v. Hutchison, 61 Mo. 83; Rice v. Bunce, 49 Mo. 231; Philipps v. Edmonson, 17 Mo. 579; Austin v. Loring, 63 Mo. 19; Rollins v. McIntyre, 87 Mo. 496. (4) The contract in evidence is a mere option to purchase coupled with possession. Warren v. Castello, 109 Mo. 343; Huggins v. Stafford, 67 Mo. App. 469; Mastin v. Grimes, 88 Mo. 479. Plaintiff was entitled to possession only by virtue of his contract. De Bernardi v. McElroy, 110 Mo. 657. (5) The respondent should not be permitted to maintain this suit, unless he has shown performance of the contract on his part, which would necessarily include the payment of the monthly installments pro-

vided for in the contract and could not be met by a default of ten months. De Bernardi v. McElroy, 110 Mo. 657; Gibbs v. Sullens, 48 Mo. 237; Rose v. Perkins, 98 Mo. 253; Fulkerson v. Brownlee, 69 Mo. 371. (6) A tender of all arrearages was an essential prerequisite to the bringing of this suit. Ailey v. Burnett, 134 Mo. 319. (7) Respondent is by his conduct estopped to claim any right whatever to the real estate in suit. Gregg v. Von Phul, 1 Wall. 274. (8) The purchase by Hettie Lindsay of the property in controversy at the foreclosure sale at least had the effect to convey to her all of the interest of E. M. Lindsay in and to the real estate and to the contract under consideration. Ailey v. Burnett, 134 Mo. 319. (9) If respondent's contention with reference to the amount of his liability on the special taxbill for grading and paving Cherokee street, were correct, then his remedy with reference to the trust deed and note would have been to have made timely objections to the amount of the note and to have asked for a credit thereon reducing same. Gregg v. Von Phul, 1 Wall. 274. (10) The rendition of the account which accompanied the warranty deed and the notice of the execution of the note and trust deed would at the very least create as good an estoppel as an account stated and acquiesced in. Powell v. Railroad, 65 Mo. 658; Kent v. Highleyman, 17 Mo. App. 9; Shepherd v. Bank, 15 Mo. 143; Brown v. Kimmel, 67 Mo. 430; McCormack v. Sawyer, 104 Mo. 36; McKeene v. Bank, 74 Mo. App. 281; Railroad v. Com. Co., 71 Mo. App. 299; Columbia B. Co. v. Berney, 90 Mo. App. 96. (11) The judgment is erroneous. It orders the cancellation of a trust deed and note which E. M. Lindsay, under his contract, had full and complete power to make. It does not undertake to deal in any manner with the trustee's deed. It decrees possession of the real estate, when no such relief was sought by the petition. It gives a judgment against Hettie Lindsay for thirty dollars per month rent,

when no such issue was made by the petition. No such issue was tried by the court. The court does not take into account the expenses of the foreclosure of the trust deed, nor the expenses of the ejectment suit. The judgment was entered November 16, 1908, yet no interest is allowed on the item of $1207 found to have been due March 19, 1907, twenty months before this judgment was rendered, and nine months before the judgment in the ejectment suit, although the contract provides that the debt shall bear interest at the rate of six per cent per annum. (12) Nothing short of a tender will stop the running of interest, and such tender must be kept good. Landis v. Saxton, 89 Mo. 382; Knollenberg v. Nixon, 171 Mo. 454; Ruppel v. Sav. & Bldg. Ass'n, 158 Mo. 622.

*Culver, Phillips & Spencer* for respondent.

(1) If the right was reserved to the vendor to mortgage the property only for five hundred dollars a mortgage made by him for one thousand dollars would be wholly unauthorized, and if the mortgagee had knowledge of the facts at the time the mortgage was taken the mortgagee would acquire no rights by the mortgage nor any title by a purchase at the sale under the mortgage as against the mortgagor's vendee. It therefore follows that if the power was reserved to Ernest Lindsay to give a deed of trust on the property at any time before the deed was delivered "for the full amount remaining unpaid," a deed of trust executed by him to secure a sum substantially in excess of the full amount unpaid would carry no title to Mrs. Lindsay as against the plaintiff if she took the mortgage and bought at the foreclosure sale with knowledge of the facts. Since Ernest Lindsay had knowledge of all the facts, and since he represented his mother in taking the deed of trust, in having it foreclosed, and in purchasing the property at the sale,

she must be charged with the knowledge of her agent, and must be held to have known that Ernest Lindsay had no right to execute the deed of trust, if the amount for which it was given exceeded "the full amount remaining unpaid" under the contract. (2) That the taxbill was void and created no lien against the property is not open to serious question. The bill was owned by the Barber Asphalt Co. Lindsay had no interest in it whatever. He had no interest in having it paid unless it was a lien against the property, and he did not want it paid, because he resisted the suit brought by the owner of the bill to collect it. In these circumstances it is clear that the parties intended that the purchaser, and not the vendor, was to pay the taxbill if it was a lien on the property. The object of the provision in the contract was not to create an obligation, if none existed, in favor of the Barber Asphalt Co., in which neither was interested, but to show clearly that the vendee and not the vendor was to take care of the taxbill if it was a lien. The provision that the purchaser agrees "to pay the special taxbills for paving and grading Cherokee street" is a part of a single sentence which treats entirely of the payment of obligations which should constitute liens against the property. The payment of liens, and who should pay them were the only things in the minds of the parties when they placed that single sentence in the contract.

LAMM, J.—Equity. On March 18, 1908, plaintiff sued in the Buchanan Circuit Court to set aside a deed of trust and trustee's deed purporting to convey to defendant Hettie Lindsay lot one in block 3, South St. Joseph Town Company's Second Addition to the city of St. Joseph, and for an accounting. The prayer of the bill was further that defendants be compelled to convey in default of such conveyance, title to be vested out of them and into plaintiff.

From a decree finding the issues for plaintiff and granting relief in kind, with an accounting of the amount due on the contract and for rents (defendant Hettie being then in possession), and a writ of restitution, defendants come up by appeal.

Questions raised seek a summary of the pleadings and facts, to-wit:

In brief the bill alleges that in August, 1904, E. M. Lindsay contracted in writing with named purchasers Waller and Arthur in consideration of $1945 (to be paid in a cash payment of $150, and thereafter in monthly installments of twenty-five dollars, with interest at six per cent from date of contract on each installment), to sell said purchasers said lot and convey same by warranty deed in fee simple when the purchase price was fully paid. The purchasers were to have possession and pay State and county taxes for 1904, and a special taxbill for grading and paving Cherokee street. (The terms of this contract will appear more fully hereafter.)

The bill then pleads a further provision in said contract giving Lindsay the option and right, at any time before said warranty deed was executed, to put a deed of trust on the lot for the amount unpaid on said contract at that date, with usual commissions and expenses—this to be by way of a loan from any person willing to loan such amount on the premises. In that event Lindsay was to receive the proceeds of such loan, and thereupon execute to said purchasers a warranty deed with a provision therein that grantees assume the payment of such loan.

There follow allegations to the effect that the contract permitted its own assignment and that by several intermediate assignments it came finally to plaintiff who now holds all rights thereunder; that the cash payment was made, together with all monthly installments with interest, in accordance with the contract terms; that after plaintiff became the owner of

the contract it was agreed between him and E. M. Lindsay that the monthly payments were to be made at plaintiff's office; that on the 19th of March, 1907 (and on the 21st of said month), there remained due on the contract (exclusive of the Cherokee special tax-bill) $1207, principal and interest.

Referring to the Cherokee special tax, the bill alleges that it was outstanding, but the special tax-bill was void and created no lien against the lot; that on its face it called for $268.16; that on May 11, 1906, the interest accrued on said pretended taxbill was $131.91; that, without the consent of plaintiff, E. M. Lindsay on said last mentioned date paid to the holder of said void taxbill, by way of compromise and settlement, sixty per cent thereof; that although the bill was void and the compromise unauthorized, yet on the 19th of March, 1907, plaintiff was ready and willing to pay, not only the amount remaining due on the purchase contract, but the amount paid by way of compromise on the void taxbill, together with interest.

Plaintiff then goes on to set forth in his bill the particulars of an alleged plan concocted between defendants to defeat and defraud him out of his interest in the lot. In a nutshell, as there told, that plan was for E. M. Lindsay to execute to his codefendant a pretended deed of trust to secure a pretended indebtedness of $1623, which said E. M. Lindsay pretended remained unpaid on the contract, instead of $1207, the true amount, of all of which defendant Hettie had knowledge; that to further such covinous contrivance, on the 19th of March, 1907, E. M. Lindsay executed such deed of trust to a trustee securing on said lot a pretended note for such pretended amount due in three years, with semi-annual interest coupons at seven per cent; that said deed of trust provided for a default on the nonpayment of any coupon; that when the first coupon became due E. M. Lindsay, in order to create a default, failed to pay it and at once brought

about a foreclosure sale under the pretended deed of trust, at which his codefendant pretended to become a purchaser for $1700 and a pretended trustee deed was executed to her; that both said deed of trust and said trustee's deed were spread of record, and defendant Hettie Lindsay now appears of record as the owner of the lot; and that he was not notified of the execution of said deed of trust and the foreclosure thereof and had no knowledge until afterwards that the record title was vested in her by the means aforesaid.

The bill then makes an offer to pay into court such sum as may be found due, and prays relief as hereinbefore stated.

The joint answer of defendants admits that E. M. Lindsay made the contract of sale with Waller and Arthur as pleaded in the bill and then goes on to set forth its terms more fully.

Among such additional provisions of the contract pleaded in the answer was one to the effect that though the purchasers were to have possession, *ad interim*, it was as tenants of E. M. Lindsay at a monthly rental equalling the monthly payment installments, plus accrued interest, and if they failed to make such monthly payments then E. M. Lindsay was entitled to take possession.

Another was that the purchasers should take out insurance and on failure to do so Lindsay might insure and the purchasers were to reimburse him.

Another was that if E. M. Lindsay paid any taxes, "liens" or insurance the purchasers were to reimburse him, with eight per cent interest on such items—all such outlays by Lindsay with interest were to merge in and be distributed among the monthly installments and were to be repaid prior to his making a deed to the purchasers.

Another was that it was optional with Lindsay whether he paid any taxes, insurance or liens.

(Nota bene: "The above additional provisions of the contract of purchase, taken in connection with the provisions pleaded in plaintiff's bill, fairly summarize the material contract terms appearing in the pleadings.)

The answer then goes on to aver that the Barber Asphalt Paving Company held a certain taxbill against the property for paving Cherokee street; that said taxbill bore date October 2, 1901, and on its face called for $268.16, with interest at ten per cent per annum; that said bill was the one referred to in the contract of purchase; and that it was sued on by its owner on the first day of October, 1903, in the Buchanan Circuit Court.

From this point on, for several pages, the averments of the answer are directed to pleading facts showing good faith and exercise of contract rights by defendants. It is alleged that on March 19, 1907, there was due under the contract purchase $1623 to defendant E. M. Lindsay; that pursuant to the contract power he on that day executed to one A. L. T., as trustee, a deed of trust securing to his codefendant said sum on said lot; that said sum was evidenced by a note due in three years with interest payable semi-annually at seven per cent; that the deed of trust provided for default and foreclosure on the non-payment of any interest installment; that afterwards E. M. Lindsay (still pursuant to the contract power) executed a warranty deed to plaintiff with a provision therein that plaintiff assumed and agreed to pay said mortgage indebtedness; that said warranty deed was received by plaintiff on the —— day of April, 1907; that in September of that year the first semi-annual installment of interest came due; that thereupon said trustee proceeded to execute the power of sale donated, and on November 11th of that year made a sale at which the property was struck off to Hettie Lindsay for $1700; that thereupon he executed to her a trus-

tee's deed and the same was duly spread of record; that at the time of the advertisement of the sale defendants mailed to plaintiff, then a resident of Buchanan county, a copy of the sale notice and previously notified him by letter that the interest was due and unpaid; that after the sale and execution of said trustee's deed Hettie Lindsay sued one Lansaw (then plaintiff's tenant) in ejectment to the January term, 1908, of the Buchanan Circuit Court and that steps were taken in that suit culminating in a judgment at that term for possession and a writ of restitution; that said writ was presently executed and Hettie Lindsay was put in, and now holds, rightful possession.

Finally it is alleged that plaintiff had full knowledge of said ejectment suit and of the execution of the deed of trust, the warranty deed and trustee's deed; that after the execution of said deeds plaintiff stopped making monthly payments under the centract and failed to pay interest on the note or do anything else towards paying for the property; that plaintiff has no right, title or interest therein and wilfully failed to keep and perform the purchase contract; but through his agents, after his tenant was ousted in ejectment, attempted, *vi et armis,* to obtain possession by breaking doors and locks.

The reply was a general denial.

At the trial the contract of purchase was read into the record and so far as material is in substance as set forth in the pleadings. So, certain ordinances and a contract relating to the improvement of Cherokee street were introduced. Their terms are immaterial.

(*Note*: A proper construction to put upon plaintiff's bill is that the special tax was compromised by Lindsay and that plaintiff in asking equity wanted to do equity and therefore was willing to pay the compromise sum with interest. In this view of the matter

the validity of the tax is a mere moot question. Espe-
cially so as the chancellor took plaintiff at his word,
found against him for the compromise sum and plain-
tiff abided the decree without an appeal.)

A special taxbill was issued against the lot, un-
der the ordinances and paving contract, on October
2, 1901, for the amount mentioned in the pleadings
and drawing interest at ten per cent from date. It,
in terms, was chargeable against the lot and Ernest
Lindsay as owner. We infer that Ernest Lindsay is
deceased, was the husband of defendant Hettie and the
father of defendant E. M. We gather, from indirect
testimony, that the lot belonged to an estate and that
the title came to E. M. Lindsay through some domes-
tic arrangement or by descent cast. At any rate he
assumed the right to make a sale of it to Waller and
Arthur and that right stands unquestioned. When he
made that sale in August, 1904, the taxbill had then
been outstanding and unpaid for about three years,
and at said sale date said taxbill had been in suit for
over a year. It seems all the property owners on the
street united in contesting the validity of the taxbills
issued for paving Cherokee street and employed the
same attorneys to make a defense. As we make out
those attorneys were to have a contingent fee of one-
third of the amount saved off of the face of each bill.
It seems, too, that E. M. Lindsay had charge of the de-
fense against the taxbill in question, that he had been
sued thereon and had been conducting that defense,
as said, for over a year at the very time he made the
contract with Waller and Arthur. It does not appear
that Waller and Arthur or their assignees had any-
thing to do with the defense or had been called upon to
assist therein or pay the bill while the suit was pend-
ing. At a certain time in 1906 (probably in May)
Lindsay on his own motion took part in a general
compromise agreement whereby the lots on Cherokee

street were relieved of the liens of the taxbills by the payment of a compromise sum, to-wit, sixty per cent of the face of each bill. As we understand it this left an attorney fee due of one-third of forty per cent of the face of his bill, and this fee Lindsay also paid. Whether plaintiff at that very time was the owner of the interest of Waller and Arthur through intermediate transfers is not vital and is not clear on this record. It appears that plaintiff was the president of a bank and had interests in Colorado and business in Texas. Being away a great deal of the time he and Mr. Lindsay made an agreement that Lindsay's collecting agent should call at plaintiff's bank for all monthly installments on the purchase contract and plaintiff arranged with his bank to have these monthly payments made on presentation and demand and when so made they were to be charged to his account. That plan was put in operation and was continued without interruption on down until the things we are about to narrate happened. On December 5, 1906, after the compromise, E. M. Lindsay wrote plaintiff requesting that he pay the full face of the taxbill. The letter making this demand stated that if Lindsay received a check for the face within two weeks he would waive the interest. That letter said nothing about spreading the amount over the monthly installments, or about changing the plan of making monthly installments and seeking a loan under the contract option. To that letter plaintiff responded, in effect, that there had been a compromise at sixty cents of the face of the bills and that he was willing to pay that amount, it being the same rate he had paid on other lots he owned on the street. Both of these letters were silent about an attorney's fee. The record indicates that the matter then dropped and Lindsay continued to collect the monthly installments. On March 19, 1907, things began to move off at a smartish pace. On that date, at a time when there was no monthly install-

ment due, Mr. Lindsay computed the amount of the taxbill at ten per cent from its date in 1901 up to May 11, 1906 (the date he paid it), and at six per cent after that. He then added that sum to the balance to become due on the purchase contract, with interest to date. He then made a note payable to his mother for the gross amount, securing the note by a deed of trust on the lot, put the deed of record and put the note in his own safe among his mother's papers. The note ran for three years with semi-annual interest installments. The deed of trust provided for a default on the non-payment of any such semi-annual installment, and a foreclosure sale. He next made a warranty deed to plaintiff in terms subject to said deed of trust and with a provision therein to the effect that the grantee (plaintiff) assumed and agreed to pay the indebtedness secured by the deed of trust and sent the same by a registered letter to plaintiff. A foreclosure of that deed of trust followed in the ensuing November and Hettie Lindsay, through her codefendant, was the purchaser and took a trustee's deed on an alleged bid of $1700. This deed was also put of record.

(*Note*: As there is a contention by defendants that the deed of trust and warranty deed were executed in accordance with the contract and in good faith, and one by plaintiff to the contrary, the facts on this score are material to a just determination of the case.)

Attending to the facts with more particularity, it seems Mr. Lindsay was the general agent for his mother, and seems to have had a sort of *carte blanche* in all her business. Doing the best we can with the testimony, after an extended and analytical study of it, we cannot find she actually made any loan of money to her son on the lot, or accepted any loan, or paid out anything on account of such loan, or made or lost anything by the transaction, or took any personal or con-

scious part in the scheme from end to end, or that Mr. Lindsay, himself, got any money by such loan. So, the plan was alone his, and whatever was done in consummating it he did on his own initiative—she remaining passive.

In the above version, we have given our impressions of the testimony, avoiding detail and not unmindful of the fact that Mr. Lindsay seems to have drawn and signed a check against his mother's money kept by him in his name as agent in the Bartlett Trust Company, on March 16, 1907, for $5000. This check was drawn in connection with his purchase of corporate stocks in Kansas City on private account. The record seems to show, that in Mr. Lindsay's dealings as agent the line between *mine* and *thine* was not closely observed, all this, however, by his mother's acquiescence. There is a suggestion (or belief) indulged by Mr. Lindsay when on the stand that the check covered the proceeds of the loan in question in a bundle with other matters, but a close scrutiny does not satisfactorily sustain that suggestion, when taken with other testimony by him and his mother. One of his theories as a witness seems to be that he put up the loan with his mother as security for that check, but the testimony does not satisfy us on that score.

There are some facts relating to the letters written by Mr. Lindsay to plaintiff in March, 1907, bearing, it is claimed, on the equities of the case. Going back a little to that time, on March 16, 1907, he wrote and mailed the following letter to plaintiff:

Dear Sir:

I want to bring the matter of the Cherokee Avenue paving bills in front of Lots 1 and 2, Block 3, Second Addition, to a settlement, as I do not care to have it in its present unsettled state any longer. I note that you state in your letter of Dec. 24, '06, that you will settle these bills for 60 per cent of the face value of them. Is this your ultimatum in the matter and your final answer in regard to same? I will appreciate it very much if you will give me an answer to this by return mail and also mail me the insurance policies on the two places to keep in my files with the contracts. It is usual to

do this just as you would do if there was a loan on the property, the man making the loan, holding the insurance policies.

Yours truly,

That letter was unanswered and plaintiff testified he never saw it until after the foreclosure sale. He then found it opened in a bundle of other papers relating to the matter in his desk in his bank after his return from a prolonged absence. There is some testimony, however, indicating that he was in St. Joseph a day or so after March 16th.

On March 21, 1907, Mr. Lindsay sent the mentioned warranty deed by registered mail to plaintiff, and a postoffice receipt therefor, signed by plaintiff, is shown by the testimony. Inclosed in the envelope containing the deed was the following letter and statement:

"Mr. Porter A. Thompson,

So. St. Joseph, Mo.

.Dear Sir:

About Dec. 5th, '06, I wrote you concerning taxbills against lots 1 and 2, block 3, Second Addition property. These were taxbills issued for asphalting Cherokee street. On Dec. 24, '06, you wrote me stating that you would not pay more than sixty per cent of the face value of these bills, in answer to which letter I wrote you on the 16th of March, 1907, asking you if this was your ultimatum in the matter and asking you to kindly write me by return mail, if possible, stating your wishes in the matter as the bills were long past due. As is customary and essential in such transactions, I also asked you to mail me the insurance policies on your two places so that I would be protected in my loan in case the buildings should burn. I have not as yet had the courtesy of a reply of any nature from you. I have therefore decided to place lot 1, block 3, in a loan and herewith send you warranty deed for this lot, which deed is second and subject to a deed of trust dated March 19, '07, securing note amounting to $1623 running three years with interest at seven per cent per annum, payable semi-annually, the first installment of which interest comes due Sept. 19, '07. I herewith inclose you a statement showing the items of which this $1623 is made up. Unless I hear from you soon in regard to the matter I will take it for granted that you have no insurance policies on this building so that I will have to take out insurance policy myself for $700 and file with this first mortgage as per the terms of same.

Yours respectfully,

E. M. LINDSAY.

The statement referred to in the letter was this:

March 21, '07.

| | |
|---|---|
| $1045.00 | Prin. due on Contract to Mar. 19, '07. |
| 162.00 | Int. due on Contract to Mar. 19, '07. |
| | |
| $1207.00 | |
| 268.16 | Taxbill Lot 1, Block 3. |
| 131.91 | 10% Int. due on Taxbill to May 11, '06. |
| 14.30 | 6% Int. due on Taxbill from May 1, '06, to Mch. 19, '07. |
| 1.75 | Recording Deed of Trust. |

$1623.12"

Speaking of the last letter, there was evidence tending to show that plaintiff on March 21st received information there was a registered letter at the post-office. The postal officials refused to deliver it as ordinary mail, but sent plaintiff, through his messenger, a receipt to sign. This receipt he signed when traveling bag in hand he was about to leave for Colorado on a waiting train. The signed receipt was taken to the postoffice by a clerk of plaintiff's bank and the letter was handed to the clerk, who brought it and laid it on plaintiff's desk, he having gone to his train. When he returned at a certain time after the foreclosure he saw the letter and statement for the first time then open with the letter of March 16th. Plaintiff had left instructions to forward his mail. This mail was not forwarded to him. He left behind no authority with any one to deal with any phase of the matter in his business with Lindsay except to pay the monthly installments, as heretofore stated. Who opened these letters or why they (or their contents) were not forwarded to him is not disclosed. These letters were eventually found in a drawer or other receptacle of plaintiff's desk, but who put them away there is not disclosed. Neither is it clear that plaintiff was absent from St. Joseph during the whole of the summer of 1907.

After the 21st of March, 1907, Lindsay quit calling for and receiving the monthly installments due on the contract at plaintiff's bank, but plaintiff did not know of that fact until after the foreclosure. It sufficiently appears also that the monthly rental value of the property was thirty dollars per month.

When the foreclosure sale was advertised, Lindsay cut out the advertisement from the newspaper and mailed it to plaintiff, but there is testimony that he addressed the envelope improperly and that plaintiff did not get it and knew nothing of the foreclosure until after the event.

Other evidence may be summed up in this way: there is some to the effect that plaintiff caused to be furnished a policy of insurance in obedience to the request of the March 21st letter, and testimony to the contrary.

There is evidence of an attempt over the telephone, by personal interview and by correspondence, to compromise the matter after the foreclosure and allow plaintiff to redeem—we deem it unimportant.

At no time until after the decree, did plaintiff *tender* the amount he claimed to be due Lindsay. He offered to pay, but made no tender as that term is defined in the law.

Defendants put in evidence showing that after Lindsay's mother got her trustee's deed he caused a suit to be brought in her name against plaintiff's tenant in straight ejectment and that such suit, on default, ripened into a judgment followed by the execution of a writ of restitution. The proof sustained the answer on that score and plaintiff, at some uncertain time before the end of that suit, had notice of it.

Any other necessary facts anent proof, pleadings or decree will appear in the opinion.

The brief of defendants' industrious counsel takes a wide range. We think it better to formulate questions here in our own way.

(a) Defendants objected below to the introduction of any testimony. This, on the theory the bill did not state facts sufficient to constitute a cause of action. The objection was overruled and that ruling is now assigned for error. We hold the petition good and the ruling well enough. A challenge of that sort comes late and the bill is entitled to every reasonable intendment and implication in its favor. [East St. Louis Ice & Cold Storage Co. v. Kuhlmann, 238 Mo. 685, 142 S. W. 253.]

The argument in support of the assignment, as we grasp the run of it, is that plaintiff stated himself out of court when he pleaded the clause in the contract requiring the purchaser to pay the Cherokee street taxbill. But that clause, as presently seen, was one of several relating to liens and taxes. A proper construction of a contract arises on the whole subject-matter —parties, their relations to each other, the object to be subserved by the contract, and the language all considered. From that view-point neither do the pleaded terms of the contract nor the allegations of the bill mean that plaintiff was to pay this whole taxbill, whether or no and at all events, as contended. The matter is further dealt with in the next paragraph. We disallow the point to defendants.

(b) It is argued that (under the contract) Lindsay had the right to buy this taxbill, and when bought had the right (still under the contract) to collect its face with interest at ten per cent from date from the lot purchasers; and to that end (still under the contract) he had the further right and option to merge the amount of the taxbill, so computed, into the balance due on the contract, borrow enough on the lot to pay himself such aggregated sum and then make a warranty deed with a provision therein binding the prior lot purchaser, without any voice in the matter, to assume and pay the whole amount. But if Lindsay had the right to buy that taxbill such right did not

arise from the contract itself. It is silent on that point. It arose, if at all, from general principles of law giving to an individual the right to lawfully buy a vendible thing. A discussion of that theory would be academic; for under this record Lindsay did not *buy* the taxbill—he *paid* the taxbill. To buy is not to pay. If he had actually bought that bill then we would confront the situation whether the purchase contract for the lot contemplated such purchase of the bill and its enforcement in full, whether void or not, as against the purchaser of the lot by means of the option to borrow money and force the payment of the borrowed money by an assumption in the warranty deed to follow the loan under that option. Since we rule he did not buy the bill it is not necessary for us to determine the question of what rights he might have under such hypothetical purchase.

We may say, in passing, that when the contract of purchase is read from end to end and corner to corner and its cold letter is illuminated and made alive by existing facts and circumstances and the relations of the parties, it would be a harsh and unnatural construction of the contract that would permit Lindsay, while he was defending against an over-due taxbill as void, to sell the lot, thereafter carry on the defense of invalidity and then (presto! change!) without notice to the lot purchaser of his change in attitude, or the existence of any overpowering necessity, turn about, abandon the defense, and buy the bill he claimed was invalid at the time he sold the lot and fasten it at his own volition with its accumulated burdens upon the lot as a valid lien. That would be to make of the purchase contract a trap to catch the unwary purchaser by the heel. Justice to Mr. Lindsay in this case requires us to save him from the imputation of making such a contract, for the contract does not read that way.

At the time Waller and Arthur contracted to buy this lot the taxbill was three years old, it had then been in suit for a year and two months. Mr. Lindsay's hostile attitude to it was that of all the other lot owners on the street, to-wit, that it was void. He then had assumed contractual relations with his attorneys to defend against the bill. When things were in that fix, and the defense in full vigor and controlled by him, he made a sale looking to a payment for the lot in installments running for many months. The defense against the bill might fail, since, as has been aptly (if tartly) said, the uncertainty of a law suit is the only thing certain about it. Naturally enough he wanted the lot to carry that burden and take that chance. That is what the contract means, when it says the purchasers agree to pay the bill. This becomes certain when we consider other contract provisions meaning that if Lindsay paid any taxes or *liens* the amount so paid by him was to be reimbursed to him by the lot purchasers by a distribution of such amount throughout the monthly installments with eight per cent interest; or, if he exercised his option to borrow money and thereafter convey by warranty deed to the lot purchasers, such payments so made by him on taxes and liens should merge in the amount of the loan to be secured by a deed of trust and be assumed by the purchasers. This interpretation of the contract allowed Lindsay to pay the special taxbill whenever the exigencies of the suit on the bill demanded it. Under this record that is precisely what he did, and by the contract the amount so paid by him could be added to the purchase price of the lot and funded in a loan to be assumed by the purchasers.

In the above view Mr. Lindsay violated the contract when he assumed the right to compel the purchaser to repay, not only the amount of the outlay in the compromise, but several hundred dollars more, to-wit, the face of the bill and its accumulation of

interest at ten per cent. The leaven of that illegal excess, carried into the note, leavened the whole lump of the deed of trust. That instrument had no legal right to existence, and did not bind the lot purchaser. As figs do not grow on thorns, or sweet water flow from a bitter fountain in nature, so, in equity a super-structure of legality cannot be built on a substratum of illegality.

(c) Under this record E. M. Lindsay was in legal effect, his mother—only one person acted in the so-called loan, deed of trust and foreclosure and he was that person. The eye of equity cannot see her without seeing him. It must look *through* him to see her at all. Hence notice to him was notice to her and his knowledge was hers. We cannot hold her an inno-cent party in the loan nor an innocent purchaser at the sale. The equitable yardstick, then, that measures his rights measures hers and she may not with full notice, as here, hold a gift fetched to her by his hand.

(d) So, under this record the purchase contract contemplated a real loan of real money really bor-rowed—not a loan in name only, a simulated and color-able contrivance. Here there was no loan at all. So, the deed of trust purporting to secure the imaginary loan was ill of the same infirmity afflicting the loan. In equity it was a mere idle aggregation of words, a shell to be broken into dust by the hammer of the chancellor. So, a sale under such trust deed to a pur-chaser with notice, as here, conveyed subject to the equitable right of the holder of the lot purchase con-tract to redeem, unless there is something else in the case defeating redemption.

(e) It is earnestly argued there is something else in the case defeating the right to redemption. It is argued that plaintiff cannot redeem because of es-toppel, because of negligence, because the statement furnished by Lindsay to plaintiff on the 21st of March,

1907, became through plaintiff's subsequent conduct in the nature of an agreed or stated account, not to be thenceforth challenged by plaintiff. We disallow these contentions. Because:

(1) As to estoppel it was not pleaded. It makes its virgin appearance in this court. It is trite general doctrine (with exceptions not material here) that a litigant who relies on estoppel must plead estoppel. Moreover, the virtue in the plea of estoppel lies, as a general rule, in the proposition that the facts constituting the estoppel were relied on by the party to be affected, caused him to change his situation or in some way to suffer detriment or loss by reason of such reliance. All these elements are wanting in the facts of this case. Lindsay without persuasion of plaintiff, with wide open eyes, for his own by-ends and purposes voluntarily took the wrong road and travelled it to the end. Plaintiff said nothing to him and did no acts *in pais* that led him to take that road. The letters of March 16th and March 21st show beyond peradventure that he made up his own mind on his own knowledge for his own ends and acted accordingly. There had been a disagreement between him and plaintiff over the amount due on the taxbill. He cut the Gordian knot himself and took his own course at his own will. There would be no estoppel if the pleading warranted that defense.

(2) As to negligence. The rule is that no man is entitled to the aid of a court of equity when that aid becomes necessary by his own fault. That doctrine is invoked by defendants. The full statement of the facts heretofore made must be our justification for omitting an extended reference to them or a prolonged discussion of them. We rule that plaintiff's inattention to his business is not the cause of and gave no rise to the claimed right to the equitable relief here invoked. Mr. Lindsay, without any negligence on plaintiff's part *at the outset,* wrongfully fastened upon

him a simulated loan swollen by an improper excess of indebtedness in violation of the existing contract. The next day after he did that plaintiff had the right to sue. And the right was not lost to him because of mere subsequent inattention and slovenly business conduct from March, 1907, to March, 1908, keeping him from finding it out. Suppose he had found it out at once, could he have awed Lindsay from the career of his humor? Or was it his duty to try? Take a homely case to illustrate: If Roe notify his neighbor Doe that he is about to visit or has visited Doe's henroost to wrongfully appropriate or has wrongfully appropriated his hens, must Doe protest at once or lose his right to pick a bone with Roe in court?

(3) Defendants invoke the doctrine applicable to an agreed or stated account. No such issue was raised by the pleadings nor would the facts warrant such defense if it had been raised. Defendant Lindsay was not lulled into the belief by plaintiff's silence that he agreed to the account. His letters show that plaintiff was not agreeing to it. So, Lindsay did not wait to see if plaintiff by silence would agree. His blow followed his word like an echo. We know of no rule of law preventing the surcharging and falsification even of a stated account. We prefer, however, to let our ruling rest on the fact that no such issue was raised by the pleadings, hence is not here.

(f) While the answer pleaded a prior judgment in favor of Mrs. Lindsay in ejectment for possession against plaintiff's tenant, yet such judgment is not res adjudicata where there is no equitable defense pleaded. That part of the answer together with the facts sustaining it are put out of view.

(g) Complaint is made because the decree awarded rents and possession to plaintiff. The testimony on rental value went in without objection. With some hesitation we rule the point against defendants. We are constrained to this course because the doctrine

of equity is to avoid multiplicity of suits. So, when a cause is in equity the duty of the chancellor is to give rounded and perfect relief, although in doing so that relief may cover matter cognizable at law. So, under a prayer for general relief all relief may go which the proof warrants and which is within the fair intendment of the bill. The writ of restitution and the award of rents were plaintiff's due under the facts of this case and the motions for a new trial and in arrest do not clearly raise the point now made by defendants. We shall not disturb the decree on that score.

(h) Complaint is made that the chancellor did not award interest on the amount due on the contract from March 19, 1907, down to the rendition of the decree. We find that is so and for that reason and to that extent the judgment is reversed and remanded to correct that error. Plaintiff invokes and was entitled to invoke the contract of purchase. But he must stand by it and comply with it. He made no tender that would stop the running of interest and he should pay interest according to the contract as the price of his decree.

For the reason stated in the last paragraph of the opinion the judgment is reversed and the cause remanded with directions to the chancellor to compute the interest due from plaintiff as indicated and include it in the redemption price found due, and decree accordingly. All concur.